# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF THE LIQUIDATION | ) | C.A. No. 9574-VCL |
| OF FREESTONE INSURANCE COMPANY | ) | |

## OPINION

Date Submitted: April 18, 2016
Date Decided: July 7, 2016

Diane J. Bartels, DIANE J. BARTELS LAW OFFICE, Wilmington, Delaware; James J. Black, Jeffrey B. Miceli, Mark W. Drasnin, BLACK & GERNGROSS, PC, Philadelphia, Pennsylvania; *Counsel for the Honorable Karen Weldin Stewart, CIR-ML, Insurance Commissioner of the State of Delaware, in her capacity as Receiver of Freestone Insurance Company in Liquidation.*

Eric Lopez Schnabel, Robert W. Mallard, Alessandra Glorioso, DORSEY & WHITNEY LLP, Wilmington, Delaware; Michael B. Fisco, Michael M. Krauss, FAEGRE BAKER DANIELS LLP, Minneapolis, Minnesota; *Counsel for U.S. Bank National Association.*

**LASTER, Vice Chancellor.**

Freestone Insurance Company ("Freestone") is a Delaware-domiciled insurer that has been placed in liquidation. The liquidation proceeding is governed by the Uniform Insurers Liquidation Act (the "Uniform Act"), which Delaware adopted in 1953.

Under the Uniform Act, the chief insurance regulator in the domiciliary state oversees the liquidation process. Only the regulator can initiate liquidation proceedings in the domiciliary state. Once a court has placed the insurer in liquidation, the regulator takes charge of the insurer's operations and marshals its assets. The regulator also manages a statutory process for receiving, evaluating, and paying claims (the "Claims Process").

To facilitate the fair and equitable resolution of claims, the Uniform Act establishes a priority scheme with nine classes. Payments are made in order of priority by class and ratably among claimants within the same class. Claims covered by policies issued by the insurer fall under Class III. Claims of general creditors fall under Class VI. General creditors whose claims remained contingent as of the deadline for filing claims cannot recover anything unless it turns out that the insurer actually had a surplus.

As contemplated by the Uniform Act, the Insurance Commissioner of the State of Delaware (the "Commissioner") is serving as the receiver for Freestone. The Commissioner has taken over Freestone's operations and has been marshaling its assets. The Commissioner established a bar date for receiving claims and has been evaluating the claims received. As authorized by the Uniform Act, and as is customary in insurance liquidation proceedings, the order that placed Freestone into liquidation contained an

injunction barring third parties from pursuing any claims against Freestone other than through the Claims Process (the "Anti-Suit Injunction").

U.S. Bank National Association (the "Bank") has moved to lift the Anti-Suit Injunction. The Bank wishes to litigate against Freestone outside of the Claims Process, reduce its currently contingent claims to judgment, and thereby establish the amount of its claims and its status as a general creditor of Freestone.

The Bank served as the trustee under a reinsurance trust agreement (the "Trust Agreement") between Freestone and Companion Property and Casualty Company ("Companion"). The Trust Agreement secured a reinsurance arrangement that allowed Freestone to do business through Companion in jurisdictions where Freestone was not qualified to sell insurance. Under that arrangement, Companion wrote policies on Freestone's behalf, and Freestone reinsured the risk on the policies Companion wrote.

To secure its payment obligations, Freestone agreed under the Trust Agreement to place collateral in a trust account for Companion's benefit. In its capacity as trustee, the Bank had various obligations regarding the collateral. According to Companion, the Bank breached its obligations by permitting Freestone to place poor quality collateral in the trust account. When Freestone failed to make its reinsurance payments, Companion sought to access the collateral. The value of the collateral was insufficient to cover the claims being made on the underlying policies, and Companion has sued the Bank in federal court in South Carolina to recover damages (the "South Carolina Action").

As part of the Claims Process, the Bank has filed two claims notices against Freestone that relate to the South Carolina Action. But in addition to pursuing its claims

through the Claims Process, the Bank wishes to name Freestone as a third-party defendant in the South Carolina Action itself. The Bank wants to sue Freestone in that proceeding for contribution and indemnification, and it hopes to obtain a judgment. The Bank represents that it would not seek to execute on the judgment outside of the liquidation proceeding.

The Bank has asked this court to lift the Anti-Suit Injunction so that the Bank can assert and pursue its third-party claims against Freestone. Granting that relief on the facts presented would contravene the policies of the Uniform Act, interfere with the Claims Process, and impose unnecessary and unwarranted costs on Freestone and the Commissioner. The Bank's motion to lift the Anti-Suit Injunction is denied.

## I. FACTUAL BACKGROUND

The factual background is drawn from the submissions made by the parties in connection with the Bank's motion. The material facts are undisputed.

### A. Freestone And Companion Enter Into Reinsurance Agreements.

Beginning in 2005, Freestone and Companion entered into a series of reinsurance agreements pursuant to which Companion acted as a fronting insurer for Freestone.[1] The arrangement enabled Freestone to sell insurance in jurisdictions where Freestone was not qualified to do business by allowing Freestone to sell policies issued by Companion,

---

[1] At the time, Freestone was a Texas-domiciled insurer known as Dallas National Insurance Company. In 2013, Dallas National re-domiciled in Delaware and changed its name to Freestone. The parties use its current name, so this decision does too. The parties took the opposite approach with Companion, which is now known as Sussex Insurance Company. The parties call it Companion, and this decision follows their lead.

3

which had the necessary qualifications. Under the terms of the reinsurance agreements, Companion retained a portion of the premium charged for the policies and ceded the rest of the premium to Freestone. In return, Freestone agreed to reinsure Companion for 100% of the risk of loss on the policies. Companion effectively received a fee for letting Freestone use its name, with the expectation that Freestone would pay any claims under the policies.

Companion understandably wanted security for Freestone's promise to pay. To provide that security, Freestone, Companion, and the Bank entered into the Trust Agreement.[2] Under its terms, Freestone agreed to deposit collateral sufficient to cover its obligations to Companion with the Bank, which agreed to hold the collateral as trustee for the benefit of Companion.

Under the terms of the Trust Agreement, the Bank had to comply with Freestone's instructions regarding the collateral. For example, Section 4(c) of the Trust Agreement stated: "[Freestone] may direct [the Bank] to substitute Assets of comparable value for other Assets presently held in the Trust Account with written notification to [Companion]." It also specified that "[the Bank] shall comply with any such direction." At the same time, Section 7(b) of the Trust Agreement provided that

---

[2] Technically, the Bank agreed to become the successor trustee under a pre-existing trust agreement. That distinction is not important for the current motion, so this decision passes over it. The trust arrangement that Freestone, Companion, and the Bank created is not uncommon. *See* Nat'l Ass'n of Ins. Comm'rs, *Receiver's Handbook for Insurance Company Insolvencies* 410-11 (2016) [hereinafter *Receiver's Handbook*] (providing generic description of arrangement in which trust fund is used to secure payment obligations and identifying related issues for delinquency proceedings).

4

> [b]efore accepting any Asset submitted for deposit to the Trust Account, [the Bank] shall determine that such Asset is in such form that [Companion] whenever necessary may . . . negotiate such Asset without consent or signature from [Freestone] or any person or entity other than [the Bank] in accordance with the terms of this Agreement.

Under Section 7(f) of the Trust Agreement, the Bank also was responsible for providing Companion with a monthly account statement identifying the assets in the Trust Account, and the account statement was deemed "a certification of [the Bank] that the fair market value of the Assets in the Trust Account is true and correct according to the best information and belief of [the Bank]."

Section 4(c) further stated that in connection with any substitution of assets, Companion was entitled to rely on the following representation and warranty from Freestone:

> Each time that [Freestone] provides [the Bank] with [a] substitution direction it shall be considered a representation and warranty of [Freestone] that (i) the substitute Assets are Eligible Securities or cash, and (ii) [the Bank] has determined that the fair market value of the substituted Assets is not less than the fair market value of the Assets being replaced thereby.

Section 11 of the Trust Agreement defined "Eligible Securities" as cash, certificates of deposit, or other investments that insurance companies were permitted to hold under South Carolina insurance law. Under Section 7(c) of the Trust Agreement, the Bank had no "responsibility whatsoever to determine that any Assets in the Trust Account are or continue to be Eligible Securities."

As these excerpts from the Trust Agreement show, the document reflects a negotiating dynamic in which the Bank sought to limit its exposure by having as few contractual obligations as possible, while Companion sought to protect itself by imposing

5

obligations on both the Bank and Freestone. This decision need not and does not express any view on the meaning of or interrelationships among the competing contractual obligations, nor their interactions with common law principles or equitable doctrines.

Section 12 of the Trust Agreement stated that "any action or proceeding brought by [Freestone] arising out of or relating to this Agreement must be, and any action or proceeding brought by [the Bank] or [Companion] may be, brought in the Federal Court of South Carolina." For Freestone, the choice of forum clause was mandatory. For the Bank and Companion, it was permissive.

## B. The Southport Entities Acquire Freestone.

In 2013, entities affiliated with Southport Lane Advisors acquired Freestone. At the time, Southport and its affiliates were controlled by Southport's co-founder, then-majority owner, and then-chief strategist, Alexander Chatfield Burns. Under Burns' leadership, Southport pursued aggressive strategies.

On April 24, 2014, the Commissioner petitioned to place Freestone into rehabilitation, averring that Freestone was "impaired, in unsound condition, and in such condition as to render its further transaction of insurance presently or prospectively hazardous to its policyholders." Dkt. 1 ¶ 14. Freestone did not oppose the petition and consented to entry of a rehabilitation order.

The Commissioner subsequently petitioned to place Freestone into liquidation. By order dated July 22, 2014, this court granted that relief. Dkt. 68 (the "Liquidation Order"). As contemplated by the Uniform Act, the Liquidation Order appointed the

6

Commissioner as receiver. The Liquidation Order included the Anti-Suit Injunction, which provided as follows:

> All persons and entities that have notice of these proceedings or of this Order are hereby prohibited from instituting or further prosecuting any action at law or in equity, including but not limited to any arbitration or mediation, or other proceedings against FREESTONE [or the] Commissioner as Receiver . . . or from obtaining preferences judgments, attachments, or other like liens or encumbrances, or foreclosing upon or making any levy against FREESTONE or the Assets, or exercising any right adverse to the right of FREESTONE to or in the Assets, or in any way interfering with the Receiver . . . either in [her] possession and control of the Assets or in the discharge of [her] duties hereunder.

*Id.* ¶ 11.

In accordance with the Uniform Act, the Liquidation Order instructed the Commissioner to marshal Freestone's assets and conduct the Claims Process. The Liquidation Order set a bar date of December 31, 2015, for parties to file notices of claims against Freestone.

## C.     Companion Sues The Bank.

On March 20, 2015, Companion sued the Bank in the South Carolina Action. Companion's complaint alleged that "the Bank allowed the Trust Account[] to be depleted of Eligible Securities, including investments in reputable bonds and stocks, and instead the Trust Account[] now hold[s] securities that are illiquid and appear to have little to no value." Dkt. 251, Ex. 2 ¶ 36. Companion alleged that between May 2013 and January 2014, Freestone instructed the Bank to replace relatively liquid and secure assets in the Trust Account with less liquid and less secure interests in non-public entities, resulting in the value of the collateral in the Trust Account declining from approximately

$73 million in January 2013 to approximately $55 million in March 2014. Companion contended that the $55 million figure was itself inflated and that that the actual value of the collateral was much lower. Companion alleged that the Bank

> negligently, grossly negligently, recklessly, willfully, and/or wantonly allowed . . . Freestone to substitute into the Trust Account collateral Assets that were not of comparable value and without any independent determination that the fair market value of the substituted Assets [wa]s not less than the fair market value of the Assets being replaced.

Dkt. 251, Ex. 2 ¶ 25 (quotation marks omitted). Companion contended that by doing so, the Bank breached Sections 4(c) and 7(b) of the Trust Agreement.

On May 18, 2015, the Bank moved to dismiss the complaint, arguing that it merely followed Freestone's instructions and could not be held liable under the terms of the Trust Agreement. On November 24, 2015, the United States District Court for the District of South Carolina (the "South Carolina Court") largely denied the motion. *See Companion Prop. v. U.S. Bank Nat'l Ass'n*, 2015 WL 7568613 (D.S.C. Nov. 24, 2015).

**D.     The Bank Files Claims Notices, Then Seeks Leave To Sue Freestone In The South Carolina Action.**

On December 31, 2015, the Bank filed two claims notices as part of the Claims Process. Both related to the South Carolina Action.

The Bank filed the first claims notice in its capacity as trustee under the Trust Agreement. That notice asserted claims on behalf of Companion, the Bank's beneficiary, to the extent that Companion "suffered damages as a result of actions or inactions of Freestone, including, but not limited to, the direction of Freestone or its agent to purchase assets placed in the Companion Reinsurance Trust." Dkt. 256, Ex. C at A-2.

8

The Bank filed the second claims notice on its own behalf. That notice sought to recover any losses that the Bank incurred in the South Carolina Action, including for attorneys' fees and costs. The Bank contended that Freestone was liable to the Bank on theories of contribution, indemnification, apportionment, breach of the Trust Agreement, negligence, gross negligence, negligent misrepresentation, and fraud.

But the Bank did more than just file claims notices. On January 15, 2016, the Bank moved in this court for relief from the Anti-Suit Injunction so that it could name Freestone as a third-party defendant in the South Carolina Action. Through that litigation, the Bank seeks to obtain a judgment against Freestone that will establish its status as a general creditor and the amount of its claim. The Bank has represented that if it is successful, it will not seek to execute on the judgment but will return to this court to liquidate its claims as part of the Claims Process.

On January 29, 2016, the Bank filed a third-party complaint in the South Carolina Action that named Southport and Burns, among others, as third-party defendants. Because of the Anti-Suit Injunction, the Bank did not name Freestone as a third-party defendant, but the allegations in its pleading identified Freestone as a wrongdoer alongside Southport and Burns. According to those allegations, Freestone, Southport, and Burns

> directed the conduct that underlies Companion's claims. They caused the trusts to acquire assets that Companion now says were ineligible, they gave valuations that Companion now says were inflated, and they made representations and warranties that Companion now says were false. Meanwhile, Burns and his Southport affiliates created the assets, sold or contributed the assets to the reinsurance trust[], and received the financial benefits of the transactions.

9

Dkt. 256, Ex. A ¶ 2. The Bank asserted that if it was liable to Companion, then Southport and Burns should be liable for apportionment, contribution, and contractual and equitable indemnification.

## II.     LEGAL ANALYSIS

The question to be answered is whether this court should lift the Anti-Suit Injunction so that the Bank can litigate third-party claims against Freestone in the South Carolina Action, outside of the Claims Process. This decision does not take any position on the merits of the Bank's claims, including the allegations against Freestone. This decision assumes that the claims are fairly litigable.

There is a dearth of case law addressing when a court overseeing a liquidation proceeding under the Uniform Act should lift an anti-suit injunction. Only one Delaware decision has considered such a motion. *See In re Rehab. of Manhattan Re-Ins. Co. (Manhattan Re)*, 2011 WL 4553582 (Del. Ch. Oct. 4, 2011). The *Manhattan Re* decision holds, and the parties agree, that this court has the "the discretion to lift the preliminary injunction." *Id.* at \*8. The *Manhattan Re* decision also holds, and the parties agree, that the central inquiry is whether lifting the injunction "would not be inconsistent with the [Uniform Act] or its goal[s]." *Id.* at \*5. Unfortunately, the *Manhattan Re* decision did not provide a framework for applying this standard or identify factors to consider. The parties' initial round of briefing did not offer any assistance either.

In an effort to find guidance in a seemingly similar legal scenario, the court requested supplemental briefing from the parties on the factors that bankruptcy courts consider when deciding whether to lift the automatic stay to permit lawsuits to proceed in

10

other jurisdictions. Important distinctions between a bankruptcy proceeding and an insurance company liquidation prevent the wholesale adoption of the bankruptcy model. Most significantly, an insurance company liquidation involves a highly regulated debtor, and the Uniform Act evidences an overarching policy of centralizing proceedings in the domiciliary jurisdiction under the direction of the chief insurance regulator for that state. If anything, therefore, it should be more difficult to obtain relief from an anti-suit injunction in a liquidation proceeding than it is to obtain relief from the automatic stay in a bankruptcy proceeding.

Informed by bankruptcy court precedent, this decision weighs multiple factors in determining whether to lift the Anti-Suit Injunction to enable the Bank to name Freestone as a third-party defendant in the South Carolina Action. Having done so, this decision concludes that the balancing counsels against lifting the Anti-Suit Injunction. The Bank's motion is therefore denied.[3]

---

[3] This decision thus assumes for purposes of analysis that the Uniform Act permits a claimant that is subject to this court's jurisdiction or is a citizen of a reciprocal state to litigate a claim against an insolvent insurer in a civil action outside of the liquidation process, whether via a claim, counterclaim, or third-party claim. It therefore treats the operative question as whether, in its discretion, this court should permit the Bank to do so. In my view, the better reading of Sections 5914, 5915, and 5916 of the Uniform Act is that once an insurer has been placed in liquidation, claimants that are citizens of either the domiciliary state or a reciprocal state or otherwise subject to the jurisdiction of the domiciliary court only can pursue claims by filing claims notices either with the domiciliary receiver or, if applicable, an ancillary receiver appointed in a reciprocal state through ancillary proceedings. 18 *Del. C.* §§ 5914-5916. A series of federal and state decisions have interpreted the provisions of the Uniform Act in this fashion. *See, e.g.*, *Sears & Roebuck & Co. v. Northumberland Gen. Ins. Co.*, 617 F. Supp. 88, 89 (N.D. Ill. 1985); *Emons Indus., Inc. v. Liberty Mut. Fire Ins. Co.*, 545 F. Supp. 185, 190-91 (S.D.N.Y. 1982); *Ins. Affiliates Inc. v. O'Connor*, 522 F. Supp. 703, 706 (D. Colo. 1981);

*Ace Grain Co v. R.I. Ins Co.*, 107 F. Supp. 80, 82-83 (S.D.N.Y. 1952), *aff'd*, 199 F.2d 758 (2d Cir. 1952); *Fin. Int'l Life Ins. Co. v. Beta Tr. Corp. Ltd.,* 405 So.2d 306, 308 (Fla. Dist. Ct. App. 1981); *Integrity Ins. Co. v. Martin*, 769 P.2d 69, 70 (Nev. 1989); *Superintendent of Ins. of N.Y. v. Int'l Equip. Leasing, Inc.*, 588 A.2d 863, 886 (N.J. Super. Ct. App. Div. 1991); *Zullo Lumber v. King Constr.*, 368 A.2d 987, 990-91 (N.J. Super. Ct. Law Div. 1976); *Levin v. Nat'l Colonial Ins. Co.*, 806 N.E.2d 473, 478-79 (N.Y. 2004); *G.C. Murphy Co. v. Reserve Ins. Co.*, 429 N.E.2d 111, 115 (N.Y. 1981). Commentators have expressed the same view. *See Receiver's Handbook*, *supra*, at 17, 28; Eric P. Berg, *Injunctions Barring Suit Against Insolvent Insurance Companies: State Cooperation Through Tit-for-Tat Strategy*, 57 Rutgers L. Rev. 1377, 1386 (2005); John N. Gavin, *Competing Forums for the Resolution of Claims Against an Insolvent Insurer*, 23 Tort & Ins. L.J. 604, 606-07 (1988); Stephen W. Schwab et al., *Cross-Border Insurance Insolvencies: The Search for a Forum Concursus*, 12 U. Pa. J. Int'l. Bus. L. 303, 319 (1991). So do black letter authorities. *See* 43 Am. Jur. 2d *Insurance* § 86 (2016); 44 C.J.S. *Insurance* §§ 241, 248 (2016); 1 Steven Plitt et al., *Couch on Insurance* §§ 6:14, 6:15 (3d ed. 2016) [hereinafter *Couch on Insurance*].

The Bank reads *Manhattan Re* as authorizing a claimant to pursue a civil claim against a delinquent insurer in a reciprocal jurisdiction outside of the liquidation process as long as the claim is *in personam*, rather than *in rem*, and so long as this court has not entered an anti-suit injunction or lifts the injunction to permit the claim to proceed. Such a reading would conflict with the authorities cited in the preceding paragraph. I do not read *Manhattan Re* so broadly.

First, *Manhattan Re* did not involve a claim that otherwise would have been handled through the Claims Process. As discussed in detail below, *Manhattan Re* involved an objection to a plan of rehabilitation that turned on whether and to what degree a particular asset was the property of the delinquent insurer's estate. *See infra* Part II.E. That issue was part of the marshaling of the delinquent insurer's assets and was logically separate from and prior to the adjudication of claims. As a temporal matter in *Manhattan Re*, the question of ownership was deferred until the Commissioner sought approval of the plan of rehabilitation, but one can readily infer that it was deferred for administrative convenience, in the hope that the parties would resolve the issue, and because the ownership issue did not affect the handling of any other claims. The ownership issue that *Manhattan Re* held could be adjudicated outside of the Claims Process thus would not have been handled through the Claims Process in any event.

Second, *Manhattan Re* at most might be read to permit claims that are secured or involve statutory deposits to be litigated outside of the Claims Process. The objector in *Manhattan Re* was a reinsurer who argued that its claims were secured by the cash proceeds from a letter of credit that the delinquent insurer had drawn and placed in a

**A.      The Centralized, State-Based Regulatory Scheme For Insurer Liquidations**

Under the *Manhattan Re* decision, the overarching inquiry when considering whether to lift an anti-suit injunction in a delinquency proceeding is whether doing so "would not be inconsistent with the [Uniform Act] or its goal[s]." 2011 WL 4553582, at *5. An understanding of the Uniform Act and the policies it seeks to achieve is therefore essential to determining whether to lift the stay.

---

designated account. The objector argued that the question of ownership was an *in personam* claim that could be litigated outside of the delinquency proceeding, citing in support the provisions of the Uniform Act which permit owners of claims against special deposits or other secured claims to assert their claims in ancillary proceedings. The concept of ancillary proceedings in the Uniform Act contemplates an ancillary Claims Process handled by an ancillary receiver in a reciprocal state. *See Receiver's Handbook*, *supra*, at 17-18. The *Manhattan Re* decision, however, appears to have accepted the claimant's argument that these provisions contemplated any type of proceeding outside of the delinquency proceeding in the domiciliary state. 2011 WL 4553582, at *7. Were one to embrace that view, it only would extend to claims that are secured or involve statutory deposits. It would not apply to general creditors like the Bank.

In this case, the Bank has a contingent claim which, if proven, would give it the status of a general creditor. South Carolina appears to be a reciprocal state. *Compare* 18 *Del. C.* § 5901(8), *with* S.C. Code Ann. §§ 38-27-50(15). Under the plain language of the Uniform Act, it appears that the Bank must pursue its claims exclusively through the Claims Process in this state, unless the chief insurance regulator in South Carolina has brought ancillary proceedings and been appointed as an ancillary receiver, in which case the Bank could file claims notices with the ancillary receiver. There is no indication that an ancillary receiver has been appointed, and the Bank is not proposing to pursue claims with an ancillary receiver in South Carolina.

Although the Uniform Act appears to foreclose the Bank's proposed course as a matter of law, at a minimum for general creditors in reciprocal states, this decision does not deny the Bank's motion on that basis. This decision assumes for purposes of analysis that the Bank could proceed against Freestone in South Carolina absent the Anti-Suit Injunction and limits its holding to the discretionary question of whether to lift the Anti-Suit Injunction.

13

"Insurer insolvency is regulated by state law rather than the federal Bankruptcy Code." *Cohen v. State*, 89 A.3d 65, 72 (Del. 2014) (footnote omitted). In 1945, Congress adopted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15, to reverse a decision by the United States Supreme Court that applied the Sherman Act to insurance companies. *See United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944). Section 1 of the McCarran-Ferguson Act declares that state regulation of the "business of insurance is in the public interest." 15 U.S.C. § 1011. Section 2(a) declares that the "business of insurance . . . shall be subject" to state laws relating to the "regulation . . . of such business." 15 U.S.C. § 1012(a). Section 2(b) states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). The United States Supreme Court has recognized that "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429 (1946).

In addition to Congress' decision in the McCarran-Ferguson Act to leave the "business of insurance" to the states, Congress carved out insurance companies from the purview of federal bankruptcy law (the "Bankruptcy Code"). 11 U.S.C. § 109(b). As a result, the states have primary responsibility for regulating insurance, including insurance company insolvency proceedings.

To address this important area, "[m]any states, including Delaware, have adopted a form of the Uniform Insurers Liquidation Act." *Cohen*, 89 A.3d at 72. The National Conference of Commissioners on Uniform State Laws ("NCCUSL") promulgated the

14

Uniform Act in 1939 with the assistance of the American Bar Association, the National

Association of Insurance Commissioners ("NAIC"), the insurance departments of several

states, and other qualified experts. *See* Commissioner's Prefatory Note, *Uniform Insurers*

*Liquidation Act*, 9B U.L.A. 284, 286 (1966). Since then, as many as thirty-two

jurisdictions have adopted it.[4] When the General Assembly enacted the Uniform Act in

---

[4] *Lac D'Amante du Quebec, Ltee. v. Am. Home Assur. Co.*, 864 F.2d 1033, 1039 (3d Cir. 1988). Research has not uncovered a source that tracks the number of jurisdictions that currently adhere to the Uniform Act. NCCUSL no longer maintains the Uniform Act, having ceded the task to the NAIC. The NAIC has promulgated two more recent statutes: the Insurers Rehabilitation and Liquidation Model Act (the "Model Act"), and the Insurer Receivership Model Act ("IRMA"). *Receiver's Handbook*, *supra*, at 5.

The NAIC initially adopted the Model Act in 1968 as an updated version of the Uniform Act, and then amended it several times before it was replaced by IRMA in 2005. *Id.* at 463. "Ten sections (54-63) of the Model Act adopt much of the [Uniform Act], as well as its policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction." *Id.* at 466-67; *accord* Schwab, *supra*, at 325 (explaining that the Model Act adopts "much of the basic terminology and procedure of the [Uniform Act], as well as the same universalist policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction"); *see* Berg, *supra*, at 1379, 1384 (describing the Model Act as "more detailed" and "more comprehensive" than the Uniform Act but as providing "a framework supporting the same policies"). "Differences between the two statutes derive from the NAIC's efforts to clarify and improve [Uniform Act] provisions." Schwab, *supra*, at 325. The NAIC promulgated IRMA in 2005 as an updated version of the Model Act. *Receiver's Handbook*, *supra*, at 463.

One authority states that "each of the fifty states and the District of Columbia have enacted a version of either the" Uniform Act or the Model Act. 5 J. David Leslie & Martin C. Pentz, *Law & Practice of Insurance Coverage Litigation* § 58:2 (2016). Another authority observes that in 2005, twenty-three states still followed the Uniform Act, while thirty-three states had adopted the Model Act, either in place of or in addition to the Uniform Act. Berg, *supra*, at 1304. IRMA does not appear to have changed matters much. Texas and Utah have adopted IRMA in full, and Maine, Oklahoma, Missouri, and Tennessee have adopted parts of it. NAIC Model Regulation Serv., *Insurer Receivership Model Act*, at ST-555-3 to -8 (2015), http://www.naic.org/store/free/MDL-555.pdf.

1953, it instructed that the Delaware statute be "so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states that enact it."[5]

The Uniform Act "was enacted in response to the economic depression experienced in the United States in the 1920s and 30s. The depression resulted in the forced liquidation or reorganization of numerous insurance companies, and the ensuing receivership proceedings were plagued by many problems." Schwab, *supra,* at 310. Among other things, differences in the state-law regimes "resulted in inequality in distribution to creditors because of variation from state to state in the laws relating to priorities and in the relative proportions of local assets to local creditors." 1 *Couch on Insurance* § 6:14. The Uniform Act "was enacted in order to avoid the confusion inherent in the forced liquidation of a multistate insurance corporation, especially with regard to assets in foreign jurisdictions." Jay M. Zitter, Annotation, *Validity, Construction, and Application of Uniform Insurers Liquidation Act*, 44 A.L.R. 5th 683 (1996). The drafters identified six specific "embarrassments" that the Uniform Act sought to address:

> (1)  the inefficient administration of the liquidation process caused by the appointment of receivers other than the various State Insurance Commissioners;

---

In light of this history, the jurisdictions that have adopted the Uniform Act, the Model Act, and IRMA can be regarded generally as having enacted versions of the Uniform Act and hence as reciprocal states, at least absent a specific showing that a particular jurisdiction departed materially from the models. *See Receiver's Handbook*, *supra*, 5, 463-69.

[5] 18 *Del. C.* § 5920(b). The entirety of Title 18, Chapter 59 of the Delaware code is devoted to insurance regulation. Technically only Sections 5901(2)-(13), 5902, 5903, and 5913-5920 implement the Uniform Act. 18 *Del. C.* § 5920(a).

(2)     the lack of authority on the part of domiciliary receivers to proceed in non-domiciliary States leading to the dissipation of assets outside the home State and enabling out-of-State debtors to avoid their obligations;

(3)     the ineffective administration of the liquidation process caused by differences in the laws of the various States regarding the title and right to possession of the property of a defunct nonresident insurer;

(4)     the serious inconvenience in proving claims experienced by creditors living outside the defunct insurer's domicile;

(5)     the problems generated by diverse State laws governing preferences such as wage claims, compensation claims and tax claims; and

(6)     the inequity resulting from preferences obtained by diligent nondomiciliary creditors with advance information of an insurer's impending insolvency.

*G.C. Murphy Co. v. Reserve Ins. Co.*, 429 N.E.2d 111, 114-15 (N.Y. 1981) (formatting as separate paragraphs added). To address these and other problems, the Uniform Act centralized the liquidation proceeding under the control of the chief insurance regulator in the domiciliary state. *Receiver's Handbook*, *supra*, at 464.

Multiple features of the Uniform Act evidence the importance of centralizing the liquidation of an insurer under the control of the chief insurance regulator in the domiciliary jurisdiction. First, only the domiciliary regulator has authority to bring a statutory liquidation proceeding within the domiciliary jurisdiction, and such a proceeding is the exclusive means for liquidating an insolvent insurer. Delaware's statute illustrates both concepts. It gives the Commissioner sole control of the initiation of delinquency proceedings by providing that

[t]he Commissioner shall commence any such proceedings by application to the court for an order directing the insurer to show cause why the Commissioner should not have the relief prayed for. On the return of such

17

order to show cause and after a full hearing, the court shall either deny the application or grant the application, together with such other relief as the nature of the case and the interests of the policyholders, creditors, stockholders, members, subscribers or the public may require.

18 *Del. C.* § 5903. The words "such proceedings" refer to the immediately preceding statutory section, which makes statutory delinquency proceedings the exclusive means for liquidating a Delaware-domiciled insurer:

> Delinquency proceedings pursuant to this chapter shall constitute the sole and exclusive method of liquidating, rehabilitating, reorganizing or conserving an insurer, and no court shall entertain a petition for the commencement of such proceedings unless the same has been filed in the name of the State on the relation of the Commissioner.

*Id.* § 5902(d).

Second, under the Uniform Act, only the chief insurance regulator in the domiciliary jurisdiction can serve as the receiver for the insolvent insurer. The Delaware statute again exemplifies this approach by stating:

> Whenever under this chapter a receiver is to be appointed in delinquency proceedings for an insurer, the court shall appoint the Commissioner as such receiver. The court shall order the Commissioner forthwith to take possession of the assets of the insurer and to administer the same under the orders of the court.

*Id.* § 5913(a).

Third, the Uniform Act mandates that the chief insurance regulator takes charge of the insolvent insurer's business, marshals its assets, and oversees the insolvency proceeding. The Delaware statute provides as follows:

> An order to liquidate the business of a domestic insurer shall direct the Commissioner forthwith to take possession of the property of the insurer, to liquidate its business, to deal with the insurer's property and business in the Commissioner's own name as Insurance Commissioner or in the name of

18

the insurer, as the court may direct, and to give notice to all creditors who may have claims against the insurer to present such claims.

*Id.* § 5911(a). Elsewhere, the Delaware statute reiterates this point by stating that when the Commissioner is appointed as receiver,

> the Commissioner shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer, wherever located, as of the date of entry of the order directing the Commissioner to . . . liquidate a domestic insurer . . . , and the Commissioner shall have the right to recover the same and reduce the same to possession, except that ancillary receivers in reciprocal states shall have, as to assets located in their respective states, the rights and powers which are herein prescribed for ancillary receivers appointed in this State as to assets located in this State.

*Id.* § 5913(b). The Delaware statute further provides that

> [u]pon taking possession of the assets of an insurer, the domiciliary receiver shall, subject to the direction of the court, immediately proceed to conduct the business of the insurer or to take such steps as are authorized by this chapter for the purpose of . . . liquidating . . . the affairs or assets of the insurer.

*Id.* § 5913(e).

Fourth, the Uniform Act places the chief insurance regulator at the center of the Claims Process, which establishes a mechanism for filing, processing, and paying claims in accordance with a statutory prioritization scheme. The statute mandates that all claims be filed with the Commissioner on or before a bar date set by the court. *See id.* § 5917(b) ("All claims filed in this State shall be filed with the receiver, whether domiciliary or ancillary, in this State on or before the last date for filing as specified in this chapter."). Notably, the statute does not contemplate that the court will resolve the claims in the first instance. Instead, the statute envisions that the initial step is for the Commissioner to

19

make a recommendation regarding the claim; only then does the court entertain the claim and rule on it.[6] A sense of the complexity of the Claims Process can be gleaned from the *Receiver's Handbook*, which devotes sixty-five pages to the subject. *See Receiver's Handbook*, *supra*, at 239-304.

The Uniform Act recognizes that because of the jurisdictional limitations of the domiciliary state, it may be necessary for the chief regulator in the domiciliary state to coordinate with insurance regulators in other states by having those regulators serve as ancillary receivers if the insolvent insurer has significant assets located in their jurisdictions.[7] When this occurs and an ancillary receiver has been appointed in another

---

[6] The relevant sections state:

(c)  Within 10 days of the receipt of any claim or within such further period as the court may fix for good cause shown, the receiver shall report the claim to the court, specifying in such report the receiver's recommendation with respect to the action to be taken thereon. Upon receipt of such report, the court shall fix a time for hearing the claim and shall direct that the claimant or the receiver, as the court shall specify, shall give such notice as the court shall determine to such persons as shall appear to the court to be interested therein. All such notices shall specify the time and place of the hearing and shall concisely state the amount and nature of the claim, the priorities asserted, if any, and the recommendation of the receiver with reference thereto.

(d) At the hearing, all persons interested shall be entitled to appear and the court shall enter an order allowing, allowing in part, or disallowing the claim. Any such order shall be deemed to be an appealable order.

*Id.* § 5917(c) & (d).

[7] *See Receiver's Handbook*, *supra*, at 17-18, 27-28; *cf.* 18 *Del. C.* § 5914(a) (establishing reciprocal mechanism in Delaware for insolvency proceedings involving a foreign insurer by providing that "[w]henever under this chapter an ancillary receiver is

jurisdiction, the Uniform Act authorizes a claimant in the ancillary state to present its claim to the ancillary receiver as part of a statutory Claims Process being conducted in the ancillary state.[8] But even when this occurs and an ancillary proceeding takes place, it is the respective insurance regulators that remain in charge of the process. Moreover, the final allowance awarded to any claim pursued in the ancillary proceedings is conclusive only "as to its amount" and "its priority, if any, against special deposits or other security located within the ancillary state."[9] To recover against the general assets of the insolvent insurer or any property other than special deposits or security located within the ancillary state, the claimant must go through the Claims Process in the domiciliary state. *See Receiver's Handbook*, *supra*, at 17, 28.

---

to be appointed in delinquency proceedings for an insurer not domiciled in this State, the court shall appoint the Commissioner as ancillary receiver"); *id.* § 5914(b) (providing that in a case where the Commissioner or the court concludes that an ancillary receiver in Delaware is not warranted, "[t]he domiciliary receiver for the purpose of liquidating an insurer domiciled in a reciprocal state shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer located in this State" and shall have additional specified powers within the State of Delaware).

[8] *See* 18 *Del. C.* § 5915(b)(1); *see also id.* § 5916 (establishing a reciprocal structure for Delaware residents when delinquency proceedings have been commenced in another state against an insurer domiciled in that state and Delaware residents wish to assert claims against that insurer).

[9] *Id.* § 5915(b)(1). A special deposit claim is a type of secured claim where the security takes the form of a deposit required by state law. "The regulatory statutes of many states require that domestic and foreign insurers provide some security to the state in the form of official bonds, securities, or other devices, to ensure the performance of their obligations. These deposits may be considered to be a trust for policyholders." 1 *Couch on Insurance* § 6:17.

Another feature of the Uniform Act enables the chief regulator in the domiciliary jurisdiction to conserve the insolvent insurer's assets and avoid the expenditure of scarce resources on claims that may not receive any distribution, regardless of their strength. To ensure the fair and ratable treatment of claims, and to implement important regulatory policies, the Uniform Act establishes a priority scheme for nine different classes of claims against the general assets of the insolvent insurer.[10] Distributions from the insolvent insurer's assets are paid out to each class in order of priority and ratably within each class. The nine classes are:

- Class I: The costs and expenses of administration expressly approved by the receiver.

- Class II: The reasonable and necessary administrative expenses of the Delaware Insurance Guaranty Association, the Delaware Life and Health Insurance Guaranty Association, or any similar organization in another state.

- Class III: Claims by policyholders, beneficiaries, and insureds arising from insurance policies written by the insolvent insurer and within coverage limits;

---

[10] *See* 18 *Del. C.* § 5918. The Uniform Act recognizes two types of claims against specific property of the insurer: special deposit claims and secured claims. The owner of a special deposit claim is given priority against its special deposit in accordance with the statutes governing the creation and maintenance of the special deposit. *See id.* § 5918(c). If there is a deficiency, the owner of the special deposit claim "may share in the general assets, but such sharing shall be deferred until general creditors and also claimants against other special deposits who have received smaller percentages from their respective special deposits have been paid percentages of their claims equal to the percentage paid from the special deposit." *Id.*

The owner of a secured claim is given a choice. The owner may either (i) "surrender his or her security and file a claim as a general creditor" or (ii) "the claim may be discharged by resort to the security, in which case the deficiency, if any, shall be treated as a claim against the general assets of the insurer on the same basis as claims of unsecured creditors." *Id.* § 5918(d).

liability claims against the insolvent insurer's insureds that are within the scope of coverage and not in excess of policy limits; and policyholder's claims for refunds of unearned premium, *but excluding* (i) claims arising under reinsurance contracts, including any claims for reinsurance premiums, and (ii) claims by insurers, insurance pools, or underwriting associations for contribution, indemnity, or subrogation, equitable or otherwise.

- Class IV: Taxes owed to the United States.

- Class V: Claims of the insolvent insurer's employees, other than its officers and directors, for compensation actually owing for services rendered within the three months before the delinquency proceeding and not exceeding $1000 per employee.

- Class VI: Claims of general creditors, including claims of ceding and assuming insurers and claims by insurers, insurance pools, or underwriting associations for contribution, indemnity, or subrogation, equitable or otherwise.

- Class VII: Claims that otherwise would qualify for a higher priority class but which were not timely filed.

- Class VIII: Surplus or contribution notes and similar obligations.

- Class IX: Claims of stockholders or other owners in that capacity.

*See id.* § 5918.

Under this priority scheme, general creditors are unlikely to recover from an insolvent insurer. Moreover, the Uniform Act imposes an additional limitation on any claim that remained contingent on the bar date. In the language of the Delaware statute,

> No contingent and unliquidated claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent by an order made pursuant to this chapter, except that such claim shall be considered, if properly presented, and may be allowed to share where:
>
> (1) Such claim becomes absolute against the insurer on or before the last day for filing claims against the assets of such insurer; or

(2) There is a surplus and the liquidation is thereafter conducted upon the basis that such insurer is solvent.[11]

A general creditor whose claim remained contingent on the bar date therefore cannot recover unless the insurer proves actually to have been solvent.

Taken together, the combination of (i) a centralized claims notice procedure, (ii) the statutory prioritization scheme, and (iii) the initial evaluation of claims by the Commissioner has an important implication for the efficient handling of a liquidation: Depending on the extent of the insurer's insolvency, it may not be worthwhile to litigate low priority claims. For example, if the insurer lacks sufficient assets to cover its policyholders and any outstanding claims against them under Class III, then any general creditors in Class VI will not receive any distribution, regardless of the strength of their claims. Likewise, the holders of any claims that remained contingent on the bar date will not recover anything at all, because under such a scenario, the insolvent insurer does not have a surplus. By placing the Commissioner in charge of the liquidation and having the court act on the Commissioner's recommendation, the Uniform Act limits the extent to which resources might be wasted resolving claims that have no prospect of receiving a distribution.

As these statutory provisions demonstrate, the Uniform Act sought to "centralize the delinquency proceedings by vesting power in a single domiciliary receiver."

---

[11] *Id.* § 5928(a). A different rule applies to a contingent claim against a person insured under a policy issued by the insolvent insurer. *See id.* § 5928(b). Because of the nature of the Bank's claims, that subsection is not relevant here.

*Receiver's Handbook*, *supra*, at 464. "The policy behind encouraging centralized delinquency proceedings is to ensure that . . . the assets of the insurance company are protected to assess liabilities, necessary for equitable distribution to all interested parties." Berg, *supra*, at 1382-83 (footnote omitted). "[K]eeping all actions confined to a single forum . . . enables accurate assessment of existing liabilities, recognizing that the receiver is in the best position to assess and account for all the assets and liabilities of the insurance company for the sake of its creditors and policyholders." *Id.*

**B.    The Role Of Injunctive Relief Under The Uniform Act**

Injunctions are potent tools that courts use to enforce legal rights, prevent harm, and preserve the *status quo* pending a final adjudication on the merits. As a court of equity, this court has inherent authority to issue injunctive relief. *See* 43A C.J.S. *Injunctions* § 2 (2016). The power extends to injunctions that bar parties from suing in other forums. *Id.* § 103. Nevertheless, in the absence of a clear, mandatory, and bargained-for forum selection clause, this court traditionally has proceeded with caution when issuing anti-suit injunctions and has shown comity by striving to permit a sister court to consider first whether to stay a competing proceeding.[12]

---

[12] *Compare Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (affirming issuance of anti-suit injunction to enforce mandatory forum selection clause in bilateral contract), *with Household Int'l, Inc. v. Eljer Indus., Inc.*, 1995 WL 405741, at *1 (Del. Ch. June 19, 1995) (Allen, C.) (issuing anti-suit injunction only after twice declining to do so because of desire to show comity to courts of a sister state). *See generally Household Int'l, Inc. v. Eljer Indus., Inc.*, 1994 WL 469169, at *3 (Del. Ch. Aug. 12, 1994) (Allen, C.) (explaining that a court "that regularly issues [anti-suit injunctions] . . . risks giving substantial offense to the judicial systems of other states, most often for no reason"); *RJR Nabisco, Inc. S'holders Litig.*, 576 A.2d 654, 662 (Del. Ch. 1990) (Allen,

Although the judicial power to enforce the legal obligations established by the Uniform Act would exist independently, the Uniform Act takes the additional step of granting the court overseeing the delinquency proceeding specific statutory authority to enforce those obligations through injunctive relief, including, if necessary, injunctions granted *ex parte* and without notice. The operative provision states:

> Upon application by the Commissioner for such an order to show cause, or at any time thereafter, the court may without notice issue an injunction restraining the insurer, its officers, directors, stockholders, members, subscribers, agents and all other persons from the transaction of its business or the waste or disposition of its property until the further order of the court.

18 *Del. C.* § 5904(a). *See generally Cohen*, 89 A.3d at 90.

The Uniform Act likewise takes the additional step of granting the court overseeing the delinquency proceedings specific statutory authority to issue anti-suit injunctions. That power too would exist independently, and its exercise would be warranted in connection with the liquidation of an insurer under black letter principles of law which recognize that an anti-suit injunction is appropriate "(1) to address a threat to the court's jurisdiction; (2) to prevent evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation." 43A C.J.S. *Injunctions* § 103 (2016). Nevertheless, the Uniform Act provides explicitly that

> [t]he court may at any time during a proceeding under this chapter issue such other injunctions or orders as may be deemed necessary to prevent . . . the commencement or prosecution of any actions or the obtaining of

---

C.) (explaining role of comity for practice of issuing anti-suit injunctions and noting that comity generally calls for permitting a sister court to rule on an application for a stay).

26

preferences, judgments, attachments or other liens or the making of any levy against the insurer or against its assets or any part thereof.

18 *Del. C.* § 5904(b).

The plain language of Section 5904(b) makes the issuance of an anti-suit injunction discretionary. *Manhattan Re*, 2011 WL 4553582, at *8. But the fact that the drafters of the Uniform Act took pains to specify the existence of this authority, which the domiciliary court otherwise would have, suggests to my mind that they viewed the issuance of anti-suit injunctions as consistent with the public policies animating the Uniform Act and wished to signal that a court should exercise that authority in a delinquency proceeding more readily than it would in a different context. Because the Uniform Act seeks to centralize the liquidation process in the domiciliary jurisdiction under the control of the chief insurance regulator for that jurisdiction, the issuance of anti-suit injunctions directly serves the core public policy goal of the statute. Anti-suit injunctions issued under the Uniform Act, particularly as to proceedings in reciprocal states, are thus categorically different from and should be treated differently than a request for an anti-suit injunction in a plenary proceeding outside of the specialized, regulatory context of an insurance company delinquency proceeding.

Perhaps unsurprisingly, anti-suit injunctions are routinely entered in delinquency proceedings.[13]

---

[13] *Receiver's Handbook*, *supra*, at 15 ("It is important for the order of liquidation to include certain other items . . . . These items typically include provisions for . . . [the] enjoinment of other parties from proceeding with actions against the liquidator, the insurer or policyholders."); *id.* (explaining that liquidation order usually contains a

27

A liquidator of an insolvent insurer is likely to find that, at the outset of insolvency proceedings, such insurer is defending a substantial number of actions in a number of different forums. . . .

In almost all cases, it will be in the estate's interest to obtain a stay or dismissal of such proceedings and to require such claims to be presented and determined in the liquidation proceedings. . . . [T]his result preserves the authority of the liquidation court and allows the liquidator and the court to apply their expertise to the issues presented. The liquidation of claims in the liquidation proceedings also avoids outside interference in the liquidation proceedings and the possibility of conflicting rulings, piecemeal litigation of claims and unequal treatment of claimants. Any such consolidation of claims would also obviate the delay inefficiency and waste of assets which would occur if the estate were required to defend claims in any forum.

Gavin, *supra*, at 604; *accord Lac D'Amiante*, 864 F.2d at 1047 n.16 (quoting earlier version of Gavin article).

It seems likely that the willingness of courts to issue anti-suit injunctions in part reflects the substance of a mandatory provision appearing later in the Uniform Act, which bars efforts by claimants to obtain attachments or other liens against the insolvent insurer or its assets. In the language of the Delaware statute, that provision states that "[d]uring the pendency of delinquency proceedings in this or any reciprocal state, no action or proceeding in the nature of an attachment, garnishment or execution shall be commenced or maintained in the courts of this State against the delinquent insurer or its assets." 18

_____

provision "[e]njoining lawsuits in other courts, whether in the same jurisdiction or elsewhere"); Gavin, *supra*, at 609 ("At the outset of the liquidation proceedings, the liquidation court typically issues an injunction which enjoins all persons from bringing or further prosecuting any action against the insolvent insurer or its liquidator."); *see* Berg, *supra*, at 1379 ("Injunctions are the most common tool to ensure centralization of proceedings and protection of all interested parties.").

28

*Del. C.* § 5919. But the policies underlying the broad statutory authorization for anti-suit injunctions in delinquency proceedings go further than simply a desire to stop extra-jurisdictional collection efforts. The obvious purpose of the broader authority granted by Section 5904(b) is to enable the court "to stay all pending proceedings and enjoin the commencement of new proceedings against the insurance company to avoid interference with the insurance company's assets." Berg, *supra*, at 1379. "Like the Uniform Act, the purpose of such injunctions is to prevent premature or inequitable distribution of the insolvent insurer's assets and to prevent delay, disruption and the waste of assets which would occur if the liquidator were required to defend actions in any court where they were brought." Gavin, *supra*, at 609-10.

As both the Delaware Supreme Court and this court have recognized, the means by which lawsuits in other jurisdictions can interfere with an insolvency proceeding are not limited to collection efforts. *See Cohen*, 89 A.3d at 81 n.73; *Manhattan Re*, 2011 WL 4553582, at \*3; *Checker Motors Corp. v. Exec. Life Ins. Co.*, 1992 WL 29806, at \*3 (Del. Ch. Feb. 13, 1992), *aff'd*, 615 A.2d 530 (Del. 1992). Forcing the Commissioner to defend lawsuits in multiple jurisdictions dissipates the distressed insurer's assets by necessitating expenditures of limited resources on foreign litigation. It also diverts the Commissioner's attention from managing the insolvent insurer's affairs, marshaling its assets, and overseeing the Claims Process. Particularly if the claims pursued in the foreign litigation will have a low priority such that their owners will be unlikely to recover even if successful, the practical result of the foreign litigation is to dissipate the insolvent

insurer's limited financial resources for no purpose. Rather than funding distributions to higher priority claimants, those resources fund legal fees and other transaction costs.

Numerous other federal and state courts have recognized the importance of anti-suit injunctions in limiting the extent to which claims against insolvent insurers can be litigated outside of the delinquency proceeding.[14] Using anti-suit injunctions to consolidate proceedings in the domiciliary jurisdiction also "eliminates the risk of conflicting rulings, piecemeal litigation of claims, and unequal treatment of claimants, all of which are of particular interest to insurance companies and policy holders."[15] Put simply, "[f]or efficient rehabilitation or liquidation, the proceedings must be centralized in a single forum for the purpose of orderly assessment of creditors' claims and effective

---

[14] *See Law Enf't Ins. Co. v. Corcoran*, 807 F.2d 38, 44 n.10 (2d Cir. 1986) ("[B]y relegating claimants to a single proceeding centered in the state of domicile of the insolvent insurer, we further the state policies of uniformity that have led well over half of the states to join New York in adopting the [Uniform Act]."); *Smith v. Farm & Home Life Ins. Co.*, 506 S.E.2d 104, 107 (Ga. 1998) ("[A] central forum is necessary for the orderly liquidation of an insolvent insurer's assets. Otherwise, creditors of an insolvent insurance company will race to their respective state forums in an effort to be among the first to levy against the insurer's assets located in that state, to the great detriment of innocent policy holders who might be unaware that their interests are being usurped."); *Bard v. Charles R. Myers Ins. Agency, Inc.*, 839 S.W.2d 791, 796-97 (Tex. 1992) ("In authorizing a receivership court to enter an injunction barring suits from being brought or maintained elsewhere, the Legislature recognized the benefit, if not the practical necessity, of requiring that all claims against the insolvent insurer's estate be adjudicated in the receivership proceedings to ensure the fair and consistent treatment of all claims.").

[15] *Munich Am. Reins. Co. v. Crawford*, 141 F.3d 585, 593 (5th Cir. 1998); *see Lac D'Amiante*, 864 F.2d at 1046 (citing value of having state courts provide binding and consistent interpretations of state law through insurance liquidation proceedings).

rehabilitation or equitable distribution to creditors upon liquidation." Berg, *supra,* at 1378-79.

**C.      Factors To Be Considered When Deciding Whether To Lift An Anti-Suit Injunction**

Given the statutory structure of the Uniform Act, its fundamental goal of centralizing delinquency proceedings under the control of the chief insurance regulator in the domiciliary jurisdiction, and the role of anti-suit injunctions in serving that public policy, a strong presumption exists that an existing anti-suit injunction should not be lifted to permit a claimant to litigate against the insolvent insurer in a foreign jurisdiction. That does not mean that it should never happen. As the *Manhattan Re* decision recognized, there may be rare circumstances when the lifting of an anti-suit injunction "would not be inconsistent with the statute or its goal[s]." 2011 WL 4553582, at *5.

As noted, there is a dearth of case law addressing when a court overseeing a liquidation proceeding under the Uniform Act should lift an anti-suit injunction. In an effort to draw guidance from a similar legal setting, this decision looks to rulings on applications by general creditors to lift the automatic stay imposed by the Bankruptcy Code. *See generally* 2 Michael Bacchus & Howard J. Steinberg, *Bankruptcy Litigation* § 12:66 (2015); Robert E. Ginsberg et al., *Ginsberg & Martin on Bankruptcy* § 3.05 (2016).

Under Section 362(a)(1) of the Bankruptcy Code, the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative or other action of proceeding against the debtor." 11 U.S.C. § 362(a)(1). "The purpose of the automatic stay is to 'prevent certain

creditors from gaining preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.'" *In re Scarborough-St. James Corp.*, 535 B.R. 60, 68 (Bankr. D. Del. 2015) (quoting *St. Croix Condo. Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)). Those purposes parallel the reasons for issuing anti-suit injunctions under the Uniform Act.[16]

Once the automatic stay has gone into effect, the bankruptcy court can lift it for "cause." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause," nor does it provide factors for the court to consider. Ginsberg, *supra*, § 3.05[B]. "Cause is an intentionally broad and flexible concept, and is determined on a case-by-case basis." *Id.* § 3.05[B][4]. Frequent applications to lift the automatic stay have generated a substantial body of jurisprudence that addresses that discretionary decision. *See In re Brown*, 311 B.R. 409, 412 (E.D. Pa. 2004) ("[T]here are a multitude of reported decisions discussing relief from the stay for 'cause,' all of which are fact intensive and generally offer no precise standards . . . .").

---

[16] *See Manhattan*, 2011 WL 4553582, at *3 (discussing the substantially similar purposes of the two mechanisms); *Checker Motors*, 1992 WL 29806, at *3 n.2 (same); *accord Idaho Tr. Bank v. BancInsure, Inc.*, 2014 WL 4064063, at *6 (D. Idaho Aug. 15, 2014) ("The [Uniform Act] permits, and even anticipates, that all other proceedings in the nature of claims against the company will be stayed, and resolved instead in the liquidation process . . . . Such circumstances are, in fact, directly analogous to bankruptcy cases . . . ."). *See generally* Berg, *supra*, at 1386 (observing that the anti-suit injunction contemplated by the Uniform Act is "a right that aims at achieving the advantage provided by the Federal Bankruptcy Code's automatic stay and exclusive jurisdiction provisions").

One common approach is for the court to weigh twelve factors first identified in *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), and known colloquially as the "*Curtis* factors.*" They are:

    (1)    Whether the relief will result in a partial or complete resolution of the issues.

    (2)    The lack of any connection with or interference with the bankruptcy case.

    (3)    Whether the foreign proceeding involves the debtor as a fiduciary.

    (4)    Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.

    (5)    Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.

    (6)    Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question.

    (7)    Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties.

    (8)    Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c).

    (9)    Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f).

    (10)    The interest of judicial economy and the expeditious and economical determination of litigation for the parties.

    (11)    Whether the foreign proceedings have progressed to the point where the parties are prepared for trial.

    (12)    The impact of the stay on the parties and the "balance of hurt."

*Id.* at 799-800 (internal citations omitted).

Many decisions have applied the *Curtis* factors or cited them with approval. *See 2* Baccus & Steinberg, *supra*, § 12:66 (collecting cases). Not all bankruptcy courts follow them. The Delaware bankruptcy courts, for example, apply a three-pronged balancing test that asks:

(1)      Whether any great prejudice to either the bankruptcy estate or the debtor will result from the continuation of the civil suit;

(2)      Whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor; and

(3)      Whether the creditor has a probability of prevailing on the merits.

*Scarborough-St. James*, 535 B.R. at 68. Decisions applying this more general framework nevertheless appear to take into account many of the same considerations identified by the *Curtis* factors. *See, e.g., In re SCO Gp., Inc.*, 395 B.R. 852, 857 (Bank. D. Del. 2007) (incorporating *Curtis* factors as part of balancing process; drawing *Curtis* factors from *In re Sonnax Indus. Inc.*, 907 F.2d 1280 (2d Cir. 1990), which adopted them). *See generally* Ginsberg, *supra*, § 3.05 (collecting cases).

Any potential doctrinal transplant must be approached with caution, and the analogy to the automatic stay is not exact. One distinction that might be relevant in a different case is that the automatic stay in bankruptcy is indeed automatic, while the issuance of an anti-suit injunction under the Uniform Act is discretionary. As the Commissioner correctly observes, the discretionary stay under the Uniform Act was modeled on the Bankruptcy Act, which pre-dated the Bankruptcy Code and which did not incorporate an automatic stay. The automatic stay arrived later, in 1973, "with the advent

34

of the Bankruptcy Rules of Procedure" that foreshadowed the Bankruptcy Code. *Baum v. Anderson*, 541 F.2d 1166, 1169 (5th Cir. 1976).

The Commissioner contends that this difference cautions against relying too heavily on precedent interpreting the automatic stay. One might posit that when a stay is imposed automatically, there would be a greater risk that it would sweep too broadly. In response, courts might be more willing to lift an automatic stay. The Bankruptcy Code in fact provides as a general rule that if a party in interest requests relief from the automatic stay, then the stay will terminate thirty days after the request "unless the court, after notice and a hearing, orders such stay continued in effect." 11 U.S.C. § 362(e)(1). By contrast, when an anti-suit injunction is issued as a matter of discretion, one might expect more tailored rulings, and courts therefore might be less willing to revisit their prior decisions. While theoretically plausible, that distinction is not present here, where the Anti-Suit Injunction was entered as a broad prophylactic measure analogous to the automatic stay. The question now is whether to modify that prophylactic measure, not whether to revisit a prior decision that granted a targeted anti-suit injunction. This case therefore involves a scenario more closely paralleling an application for relief from the automatic stay, and the bankruptcy courts' extensive experience with those applications offers a source of insight.

But there is a more important consideration which in my view does apply to this case, namely that a delinquency proceeding under the Uniform Act is a more specialized type of proceeding than a bankruptcy under federal law and has a stronger regulatory overlay. As the discussion of the Uniform Act demonstrates, an insurance liquidation

35

proceeding under state law represents the culmination of the regulation of its business by the chief regulator of the domiciliary state, effectuated (to borrow a religious analogy coined by Justice Jack B. Jacobs) through the regulator's administration of last rites to the regulated entity. *See* Jack B. Jacobs, *Delaware Receivers and Trustees: Unsung Ministers of Corporate Last Rites*, 7 Del. J. Corp. L. 251 (1982). Unlike a federal bankruptcy proceeding, which is available to non-regulated biological and non-biological persons of all stripes, a delinquency proceeding under the Uniform Act has purposes, substantive standards, and procedural mechanisms that are tailored to the insurance context. It was the greater specialization of state insurance liquidation proceedings that provided the original, pre-McCarran-Ferguson Act policy rationale for excluding insurance company liquidations from the scope of federal bankruptcy law:

> The affairs of an embarrassed or insolvent insurance company often require much technical skill and judgment and time for their adjustment and a carrying forward of the business, to prevent lapses and to permit reinsurance to simplify them. And considering the variety of insurance obligations assumed and the various statuses thereof, a chief practical difficulty is the ascertainment of who are really to be considered creditors and in what amounts, often requiring much time and elaborate accounting for its solution. Under such circumstances even the election of a trustee in bankruptcy could be difficult, and a creditors' meeting could hardly prosecute any business, owing to conflicting interests of the various classes of claims.

*In re Supreme Lodge of the Masons Annuity*, 286 F. 180, 184-85 (N.D. Ga. 1923). Any effort to gain insights form the bankruptcy arena must remain sensitive to those differences. This decision therefore does not adopt any bankruptcy precedent wholesale, but treats those precedents as informative.

**D. The Allocation Of The Burden And The Factors That This Decision Will Consider**

In my view, as the party seeking to litigate against the insolvent insurer outside of the delinquency proceeding, the Bank bears the burden of demonstrating that lifting the Anti-Suit Injunction "would not be inconsistent with the [Uniform Act] or its goal[s]." *Manhattan Re*, 2011 WL 4553582, at \*5. Because of the strong policy of centralization manifested in the Uniform Act, the burden of persuasion is a heavy one, with any doubts resolved against permitting the party to litigate elsewhere. Placing the burden of persuasion on the party seeking to lift the Anti-Suit Injunction comports with the general approach taken to interpreting regulatory statutes in the insurance context:

> The state has an important and vital interest in the liquidation of an insolvent insurance company. The only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory. Because the insurance business is affected with a public interest, the law relating to liquidation and dissolution of insolvent domestic companies is liberally construed in favor of policyholders, creditors, and the public.

1 *Couch on Insurance* § 5:35 (footnotes omitted).

In considering whether to lift the Anti-Suit Injunction to enable the Bank to sue Freestone in the South Carolina Action, this decision weighs the following factors:

(1) The nature and extent of any connection between the foreign litigation and the domestic liquidation proceeding, including

    a. Whether the foreign litigation involves the insolvent domestic insurer holding property in a custodial or fiduciary capacity, or as a bailee or conduit for the goods or proceeds in question, or

    b. Whether the insolvent domestic insurer itself has insurance coverage that will cover the foreign litigation and whether the

37

carrier has assumed full financial responsibility for the foreign litigation.

(2)     The interests of judicial efficiency and litigant economy, including

   a.   Whether the foreign litigation can decide the issue more efficiently and expeditiously than the domestic liquidation proceeding;

   b.   Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;

   c.   How far the foreign litigation has progressed, and

   d.   Whether the foreign litigation will completely resolve the issue.

(3)     Whether the foreign litigation would prejudice the interests of the Commissioner, other claimants, or other interested parties, including

   a.   Whether the foreign litigation is likely to result in a judgment that will give rise to a claim entitled to a recovery in the domestic liquidation proceeding given its priority under the Uniform Act;

   b.   The amount of the likely payment relative to the burden on the insolvent domestic insurer, and

   c.   Whether the claim that would result from the foreign judgment would be subject to equitable subordination or other doctrines.

(4)     The balance of hardships and whether the party wishing to proceed with foreign litigation has shown that the hardship it would suffer from not being able to proceed considerably outweighs the hardship to the Commissioner and the insolvent domestic insurer.

As with other multi-factor tests, these factors are not intended to establish an exclusive or exhaustive list of considerations.[17] Additional factors may be relevant in future cases, and

---

[17] *Cf.*, *e.g.*, *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1051-60 (Del.

38

the common law process may demonstrate that some of the enumerated factors prove unhelpful and warrant little to no weight. The balancing is not a mathematical exercise.

### 1. The Nature And Extent Of Any Connection Between The Foreign Litigation And The Domestic Liquidation Proceeding

The first factor that this decision applies is the nature and extent of any connection between the foreign litigation and the domestic liquidation proceeding, together with the risk that the foreign proceeding could interfere with the liquidation proceeding. This factor draws by analogy on the second *Curtis* factor, which is "[t]he lack of any connection with or interference with the bankruptcy case." 40 B.R. at 800. As the *Curtis* court noted, "[e]ven slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit." *Id.* at 806; *see In re Penn-Dixie Indus., Inc.*, 6 B.R. 832, 836 (Bankr. S.D.N.Y. 1980).

The closer the connection is between the foreign litigation and the domestic liquidation proceeding, the greater the likelihood of interference. If the foreign litigation relates to a core function of the receivership, such as marshaling assets or assessing

2015) (balancing non-exclusive list of factors to be considered when determining choice of law under the Restatement (Second) of Conflict of Laws (1971)); *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1104-05 (Del. 2014) (identifying non-exclusive list of factors to be considered when conducting *forum non conveniens* analysis); *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1269 (Del. 2013) (identifying a "non-exhaustive list of factors" that a trial court may consider when evaluating the reliability of expert testimony under *Daubert v. Merrill-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)); *In re Poliquin*, 49 A.3d 1115, 1134 (Del. 2012) (identifying a "non-exhaustive lift of aggravating factors" that may be considered when imposing attorney discipline); *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 150 (Del. 1980) (identifying non-exhaustive list of multiple factors to be considered when awarding attorney's fees under common fund and common benefit doctrines).

claims, then this factor counsels against relief from an anti-suit injunction. Even the prospect of forcing the Commissioner to expend time and resources litigating elsewhere may be sufficient to cause this factor to weigh against relief, because a central purpose of the Uniform Act is "to avoid dissipating a distressed insurer's assets by allowing it to be sued, and requiring it to defend, litigations scattered in many jurisdictions throughout the country."[18]

By contrast, a situation where this factor could support relief from an anti-suit injunction might involve a suit against the insolvent insurer that did not actually seek to

---

[18] *Manhattan Re*, 2011 WL 4553582, at *3 (quoting *Checker Motors*, 1992 WL 29806, at *3); *accord Cohen* 89 A.3d at 81 n.73; *see Munich Am.*, 141 F.3d at 593 (ordering federal court to abstain from hearing claim in deference to insurance proceeding; observing that "[i]n addition to the interests served by orderly adjudication of claims . . . , consolidation presents the unnecessary and wasteful dissipation of the insolvent company's funds that would occur if the receiver had to defend unconnected suits in different forms across the country"); *Lac D'Amiante*, 864 F.2d at 1046 (directing federal court to abstain from hearing insurance issue; describing role of insurance regulator as liquidator and explaining that "independent proceedings against an insurer placed into insolvency are highly disruptive to the state's regulatory scheme").

The weight given to the risk that foreign litigation will dissipate the insurer's resources and divert the attention of the regulator marks one area where the public policies underlying the Uniform Act suggest a different answer than the Bankruptcy Code. Under the former regime, these costs are a significant concern. Under the latter, they are frequently discounted. *See, e.g.*, *In re Santa Clara Cty. Fair Ass'n*, 180 B.R. 564, 566 (B.A.P. 9th Cir. 1995) ("Ordinarily, litigation costs to a bankruptcy estate do not compel a court to deny stay relief."); *In re Burger Boys, Inc.*, 183 B.R. 682, 688 (S.D.N.Y. 1994) ("Courts have held, however, that the increased costs of litigating in a particular forum are not so prejudicial as to require continuance of a stay."); *In re Roger*, 539 B.R. 837, 848 (C.D. Cal. 2015) (reversing denial of stay relief in part because "the record does not contain any documentary evidence concerning projections regarding the comparative attorneys' fees and expenses that would be amassed by litigating in the different fora").

establish a claim against the insurer, but which instead sought to secure property or assets that the insurer was holding in a custodial or fiduciary capacity. This example draws by analogy on the third *Curtis* factor, which envisions a situation where the debtor is merely holding property as a fiduciary,[19] and the sixth *Curtis* factor, which identifies an action

---

[19] The actual language of the third *Curtis* factor is "[w]hether the foreign proceeding involves the debtor as a fiduciary." *Curtis*, 40 B.R. at 800. This court frequently hears litigation involving claims for breach of fiduciary duty, which are often highly complex and heavily litigated proceedings. At first blush, the third *Curtis* factor seems to envision deferring to a foreign court to oversee this type of litigation. Closer examination of the *Curtis* decision and the case that it cited in support of this factor, *In re Bailey*, 11 B.R. 199, 201 (Bankr. E.D. Va. 1981), reveals that both relied on the legislative history of Section 362, which mentioned fiduciary status as part of a broader discussion of instances in which the debtor did not hold the property in its own name but rather for others:

> The lack of adequate protection of an interest in property of the party requesting relief from the stay is one cause for relief, but is not the only cause. . . . Other causes might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors. The facts of each request will determine whether relief is appropriate under the circumstances.

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 343-44 (1977), *quoted in Curtis*, 40 B.R. at 799. The reference to the "debtor as a fiduciary" is thus not a reference to a claim against the debtor for breach of fiduciary duty, but rather to a situation where the debtor has nominal legal title but not equitable title. By contrast, a claim for breach of fiduciary duty, if proven, generates a judgment against the debtor, and hence such a claim does involve the "purpose of the automatic stay, which is debtor protection from his creditors." *Id.*; *see Pink v. Title Guar. & Tr. Co.*, 8 N.E.2d 321, 324-25 (N.Y. 1937) (requiring parties asserting counterclaims for breach of fiduciary duty to pursue them through

41

that "essentially involves third parties" in which "the debtor functions only as a bailee or conduit for the goods or proceeds in question." 40 B.R. at 800. In these scenarios, the foreign litigation should not require meaningful expenditures of resources by the receiver, nor would the foreign litigation result in a judgment against the insurer.

Other situations that could lead to this factor supporting relief from the anti-suit injunction would include cases where the insolvent insurer is not itself at risk, such as where the insurer itself had insurance coverage that will cover the foreign litigation and the carrier has agreed to assume full financial responsibility for the foreign litigation. This example draws by analogy on the fifth *Curtis* factor, which envisions a situation where "the debtor's insurance carrier has assumed full financial responsibility for defending the litigation."[20]

In this case, the claims that the Bank wishes to assert in the South Carolina Action relate directly to the insurance liquidation proceeding. The Bank has filed claims notices as part of the Claims Process, thereby recognizing that if its claims are not litigated in the

---

claims process in insurance company liquidation proceeding).

[20] 40 B.R. at 800; s*ee Webster v. Superior Court*, 758 P.2d 596, 597 (Cal. 1988) (holding that claimant injured in shooting rampage in offices of insolvent insurer should have been permitted to pursue personal injury claim outside of liquidation process where insurer had liability insurance that would cover any claim plus the expenses of defending it and where claimants stipulated that they would not seek any recovery from the insolvent insurer's assets). *See generally* Ginsberg, *supra*, § 3.05[B][4][a] ("Where the debtor is a defendant in an action where any judgment will be covered by insurance (most commonly a personal injury suit), the plaintiff should be granted relief to pursue the action. This is because the claim, if proved valid at trial, will be satisfied, not from property of the estate or from property of the debtor, but by the insurance company.").

South Carolina Action, they will be handled as part of the insurance liquidation proceeding. Requiring the Commissioner to defend the South Carolina Action will force the Commissioner to divert a portion of Freestone's limited resources to litigation defense, thereby dissipating Freestone's assets. The Commissioner also will be forced to devote attention to the South Carolina Action, diverting the Commissioner from her core tasks of managing Freestone's business, marshaling its assets, and overseeing the Claims Process. This is not a case in which the Bank seeks to obtain property that Freestone was merely holding in a custodial or fiduciary capacity, nor is there an alternative source of funds that would cover the Commissioner's legal expenses or any judgment, such as insurance proceeds. This factor weighs heavily against lifting the Anti-Suit Injunction.

### 2.     The Interests Of Judicial Efficiency And Litigant Economy

The second factor this decision considers incorporates the interests of judicial efficiency and litigant economy. As long as considerations of fundamental fairness and due process are satisfied, the legal system has an obvious interest in resolving disputes in an expeditious and economical manner, both for the parties involved and for the legal system as a whole. This factor adheres closely to the tenth *Curtis* factor, which calls for considering "[t]he interest of judicial economy and the expeditious and economical determination of litigation for the parties." 40 B.R. at 800.

Pertinent considerations under this heading include whether the foreign litigation will proceed in a specialized tribunal that has been established to hear the particular cause of action, how far the foreign litigation has progressed, and whether the foreign litigation will completely resolve the claims and avoid any need for them to be addressed in the

43

insurance proceeding. These considerations draw on the first, fourth, and eleventh *Curtis* factors, which are

> (1)     Whether the relief will result in a partial or complete resolution of the issues[;]
>
>     . . . .
>
> (4)     Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases[;]
>
>     . . . . [and]
>
> (11)     Whether the foreign proceedings have progressed to the point where the parties are prepared for trial.

*Id.* at 799, 800.

When applied to a delinquency proceeding under the Uniform Act, this factor and its subsidiary considerations reinforce the presumption against lifting the Anti-Suit Injunction that is manifested by placing the burden of persuasion on the party seeking to litigate elsewhere. The Uniform Act already seeks to achieve the goals of judicial efficiency and litigant economy by centralizing the liquidation process in a single jurisdiction. Moreover, the statutory liquidation proceeding is itself a specialized proceeding, overseen by the domiciliary court, in which the chief insurance regulator of the domiciliary state takes charge of the insurer's affairs, marshals its assets, and manages the Claims Process. The Claims Process itself serves as an additional form of specialized proceeding that permits classes of claims against an insolvent insurer to be resolved expeditiously, particularly when those categories of claims will not be entitled to any distribution under the statutory priority scheme. *See* 1 *Couch on Insurance* § 6:7

44

(describing claims resolution process); Francine L. Semaya & William K. Broudy, *A Primer on Insurance Receiverships*, 40 The Brief 22, 29-30 (2010) (same). Numerous courts have recognized the value of the specialization of the state-law insurance liquidation process and the expertise of the state insurance regulators in carrying it out.[21]

In this case, there are no countervailing factors that would favor permitting the Bank to litigate against Freestone in the South Carolina Action. The South Carolina Court

---

[21] *See, e.g.*, *Lac D'Amiante*, 864 F.2d at 1045 (deferring to state insurance liquidation proceeding in light of role of states as "preeminent regulators of insurance in the federal system" and the structure of the state-law regulatory system); *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 705 (10th Cir. 1988) (deferring to state insurance delinquency proceeding in light of the state's "complex and comprehensive scheme of insurance regulation which contains the [Uniform Act] for the liquidation of an insolvent insurer"); *Law Enf't Ins. Co. v. Corcoran*, 807 F.2d 38, 44 (2d Cir. 1986) (deferring to state insurance liquidation proceeding given "the state's strong interest in centralizing claims against an insolvent insurer into a single forum where they can be efficiently and consistently disposed of"); *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir. 1980) ("The Superintendent of Insurance is an experienced state official who has been involved both in rehabilitating and liquidating [the insolvent insurer]. Liquidation in particular is an area in which the Superintendent's expertise is critical. Liquidation proceedings involve the adjustment of thousands of claims against the insurer by policyholders and those who claim under them, as well as claims by present employees, past employees, and general creditors. Moreover, the claims must be satisfied by marshalling the existing assets of the insolvent company and by reinsuring existing policies using a state fund established for this purpose."); *Blackhawk Heating & Plumbing Co. v. Geeslin*, 530 F.2d 154, 159-60 (7th Cir. 1976) (explaining that the "[t]he interests of [a domestic insurance company and its] owners policyholders, and creditors, as well as the public, are best served and protected by an orderly and efficient process of liquidation" in state court); *Motlow v. S. Hldg. & Sec. Corp.*, 95 F.2d 721, 724, 725-26 (8th Cir. 1938) (describing New York system for insolvency proceedings involving domestic insurers as "comprehensive, economical, and efficient"; rejecting attempt by creditor to assert claim belonging to insolvent insurer in federal court, outside of liquidation proceedings; explaining that "other courts, except when called upon by the court of primary jurisdiction for assistance, are excluded from participation [in liquidation proceedings" and that "[t]his should be particularly true as to proceedings for the liquidation of insolvent insurance companies"), *cert. denied*, 305 U.S. 609 (1938).

is certainly a distinguished and qualified court, and there is no question that it can capably address any claims that the Bank wishes to bring against Freestone. But the South Carolina Action is a plenary proceeding, not a specialized proceeding, and the South Carolina Court is not a specialized tribunal.

This is also not a situation where the South Carolina Action is on the verge of trial such that it might make sense to defer to the outcome of that litigation. The South Carolina Action remains at an early stage. The South Carolina Court has denied the Bank's motion to dismiss Companion's claims, but that is all. The Bank's claims against Freestone have yet to be asserted. Nor would the outcome of the South Carolina Action resolve completely the issues surrounding the Bank's claims against Freestone. The most that can be said is that if this court lifts the Anti-Suit Injunction, then any decision by the South Carolina Court would be binding on the Commissioner and this court for purposes of establishing Freestone's liability and the facial amount of its claim. That is true generally under principles of collateral estoppel, *see Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 616 (Del. 2013), and by analogy to how the Uniform Act handles secured claims and claims against statutory deposits held by non-residents who elect to proceed in ancillary proceedings rather than in the domiciliary proceeding.[22] The decision

---

[22] *See* 18 *Del. C.* §§ 5915 & 5916. As discussed previously, when delinquency proceedings have been commenced in one state against an insurer domiciled in that state, and when the scope of the insurer's operations warrants the insurance regulator in another state commencing ancillary proceedings in that state that result in the insurance regulator in the sister state serving as an ancillary receiver, then residents of the ancillary state can present a claim to the ancillary receiver. The final allowance as determined in the ancillary proceedings is "conclusive as to its amount" and "shall also be accepted as

would not be binding for purposes of determining the priority of the resulting claim or the amount of any distribution from Freestone that the Bank might receive. The Bank recognizes this point by accepting that it could not execute on any judgment that it might obtain through the South Carolina Action but would have to return to this court and participate in the liquidation process.

The Bank has suggested that this court should defer to the South Carolina Action because the Trust Agreement contains a forum selection provision that identifies the South Carolina Court as a permissible forum where Freestone can be sued. The forum selection provision is only mandatory for claims that Freestone might assert; it is permissive as to claims brought by the Bank or Companion. As among the parties to the Trust Agreement, therefore, the provision does not require that the Bank sue in the South Carolina Court. Regardless, in my view, even a mandatory forum selection provision would not automatically bind the Commissioner when exercising the State of Delaware's regulatory and police powers under the Uniform Act. It is true, generally speaking, that the Commissioner stands in the shoes of the insolvent entity when it acts as receiver, but that general principle has limitations, and it does not allow private parties to trump the statutory provisions and public policies of the domiciliary state, such as the public policy of centralizing proceedings in the domiciliary jurisdiction and the statutory provisions

conclusive as to its priority, if any, against special deposits or other security located within this State." *Id.* § 5916(b)(2). The concept of ancillary proceedings as used by the Uniform Act does not encompass any plenary lawsuit that a creditor chooses to file in another state, or any counterclaim or third-party claim that the creditor chooses to assert in pending litigation in another state.

that implement that policy. The *Manhattan Re* decision reached the same conclusion implicitly when it determined that it had discretion to determine whether the parties in that case would have their dispute heard in arbitration, notwithstanding that the arbitration provision would have been mandatory if the Commissioner had not taken over as receiver for the insurer in the context of a receivership proceeding. 2011 WL 4553582, at *7. That does not mean that a mandatory forum selection provision would not be taken into account, only that it is not itself dispositive. Because the forum selection provision in this case was not mandatory, this decision need not dilate further on the issue.

Under the circumstances, the second factor does not favor lifting the Anti-Suit Injunction. The Claims Process, not the South Carolina Action, provides the more specialized, efficient, and cost-effective method of completely addressing the Bank's claims against Freestone.

### 3. Prejudice To The Interests Of The Commissioner, Other Claimants, And Other Interested Parties

The third factor that this decision considers is whether permitting a claimant to proceed with the foreign litigation would prejudice the interests of the Commissioner, other claimants, and other interested parties. This factor draws on the seventh *Curtis* factor, which is "[w]hether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties." 40 B.R. at 800.

Pertinent considerations under this heading include (i) whether the foreign litigation is likely to result in a judgment that would be entitled to a distribution in the liquidation proceeding, (ii) the amount of the likely payment relative to the burden on the

insolvent domestic insurer, and (iii) whether the claim that would result from the foreign judgment would be subject to equitable subordination or other doctrines. These considerations draw on the eighth and ninth *Curtis* factors, which take into account the priority of the eventual claim in the bankruptcy proceeding and the claimant's ability to recover. The eighth factor does so by considering "[w]hether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c)."[23] The ninth factor does so by considering "[w]hether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f)."[24]

---

[23] 40 B.R. at 800. Section 510(c) of the Bankruptcy Code "adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances." *Allied E. States Maint. Corp. v. Miller* (*In re Lemco Gypsum, Inc.*), 911 F.2d 1553, 1556 (11th Cir. 1990). Section 510(c) provides:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C § 510(c). A subordinated claimant may recover little or nothing at all. It would make little sense to expend litigant and judicial resources to pursue, dispute, or adjudicate the claim, and therefore the prospect that a claim will be subordinated counsels against lifting the stay. *See, e.g.*, *In re CLC of Am., Inc.*, 68 B.R. 512, 515 (Bankr. E.D. Mo. 1986) (declining to provide stay relief where claim would be subordinated to the claims of general creditors and would recover, if at all, only with equity holders).

[24] 40 B.R. at 800. In a bankruptcy proceeding, the debtor's assets become property

In the context of an insurer's insolvency proceeding under the Uniform Act, obtaining a judgment against the insurer in foreign litigation does not automatically lead to recovery. The claim still must be assigned a priority by the Commissioner, subject to the approval of the Commissioner's recommendation by the Court of Chancery. *See* 18 *Del. C.* § 5918. As previously discussed, Class III encompasses claims by "policyholders, beneficiaries, and insureds." Class VI encompasses claims by general creditors. In addition, claims by general creditors that remained contingent as of the bar date are not entitled to any recovery, absent a surplus. *Id.* § 5928(a). Under this priority scheme, general creditors in an insurance liquidation frequently do not receive any distributions. The prioritization scheme matters because if a claim is not likely to receive any distribution, it makes little sense to permit the claimant to pursue the claim in another jurisdiction and force the Commissioner to devote a portion of the insolvent insurer's scarce resources to defending the claim.

---

of the bankruptcy estate, subject to the debtor's right to reclaim certain property as exempt. *Schwab v. Reilly*, 560 U.S. 770, 774 (2010). Section 522 of the Bankruptcy Code specifies the types of property that is eligible for exemption. Section 522(f) provides that

> the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is . . . a judicial lien, other than [a lien involving domestic support obligations] . . . .

11 U.S.C. § 522(f)(1)(A). If the litigation for which stay relief is sought would result in a lien on exempt property, and if the debtor could avoid the lien by invoking the exemption, then "no purpose is served in granting relief from the automatic stay" to allow the litigation to proceed. *Builders & Remodelers, Inc. v. Hanson*, 20 B.R. 440, 442 (Bankr. D. Minn. 1982).

If the Bank were successful in the South Carolina Action, it would hold a Class VI claim. Moreover, because the Bank's claim remained contingent as of the bar date, the Bank only would be able to receive a distribution if "[t]here is a surplus and the liquidation is thereafter conducted upon the basis that such insurer is solvent." *Id.* That is highly unlikely. Lifting the Anti-Suit Injunction would force the Commissioner to re-purpose scarce resources that otherwise could fund distributions to policyholders and other higher priority claimants and use them to pay for litigation counsel in the South Carolina Action, with the odds-on outcome being that even if the Bank prevailed, it would recover nothing. The third factor therefore weighs heavily in favor of denying the Bank's motion.

### 4. The Balance Of Hardships

The fourth factor that this decision considers is the balance of hardships. This factor draws on the twelfth *Curtis* factor, which considers "[t]he impact of the stay on the parties and the 'balance of hurt.'" 40 B.R. at 800. The analysis of the preceding factors foreshadows the outcome of this one.

From the Commissioner's perspective, being forced to participate in the South Carolina Action yields no benefits, only costs. The South Carolina Action is a plenary, non-specialized proceeding that will not resolve the Bank's claims more efficiently than the Claims Process. Meanwhile, the Commissioner will be distracted from its statutorily identified tasks of managing Freestone's operations, marshaling its assets, and evaluating and making recommendations regarding claims. The Commissioner also will have to

devote resources to the South Carolina Action that otherwise could be used to pay in-the-money claims.

From the Bank's perspective, bringing Freestone into the South Carolina Action yields at best intangible benefits. The Bank's prospects of an eventual monetary recovery from Freestone are not heightened; they remain non-existent unless Freestone turns out to have a surplus. The best the Bank can do is contend that without Freestone in the South Carolina Action, the South Carolina Court will not be able to allocate a share of liability to Freestone, which could increase the Bank's relative share of liability. But that argument does not withstand scrutiny. To the extent that the Bank can be held jointly and severally liable in the South Carolina Action, as appears to be the case if Companion prevails, then Companion can recover 100% of its losses from the Bank. Whether Freestone is a party to the South Carolina Action does not affect that prospect; it is a function of the doctrine of joint and several liability. If Freestone were solvent, the Bank might be able to shift some of that liability to Freestone through indemnification or contribution, and Freestone's degree of responsibility might affect the contribution analysis, but Freestone's insolvency renders that prospect trivial. Even if Freestone were allocated 100% of the liability, the Bank would not be able to recover anything from Freestone (unless Freestone proves to be solvent), and therefore Freestone's share of the loss will continue to lie with the Bank.

The Bank also argues that whether or not Freestone is in the case may affect the degree to which liability is allocated among the Bank, Southport, and Burns. As the Bank sees it, Freestone's absence might result in the Bank bearing a greater share of liability.

That argument, however, cuts both ways, as the Bank can use the empty chair defense in an effort to shift blame to Freestone. Moreover, because Freestone is insolvent, the Bank, Southport, and Burns really will be arguing about how to allocate liability among themselves. The doctrine of joint and several liability makes them each potentially liable for the full extent of Companion's damages, regardless of what percentage of responsibility might be allotted to Freestone. The effect of Freestone's insolvency is to remove Freestone from the risk-sharing picture, not to alter the risk-sharing profile as among the Bank, Southport, and Burns. The Bank therefore will not suffer any incremental prejudice from not being able to name Freestone as a third-party defendant. The prejudice the Bank has suffered results from Freestone being insolvent, not the Anti-Suit Injunction. The balancing of hardships thus favors keeping the Anti-Suit Injunction in place.

## E.    The Different Outcome In *Manhattan Re*

The Bank argues that *Manhattan Re* requires a different outcome. Although the *Manhattan Re* decision did not conduct a factor-based analysis, it provides an example of a situation when the factors considered by this decision would support lifting an anti-suit injunction to permit a focused action to proceed in a specialized forum.

The *Manhattan Re* decision arose out of a delinquency proceeding involving Manhattan Re-Insurance Company ("Manhattan Re"), an insolvent, Delaware-domiciled insurer. The Commissioner had filed the delinquency proceedings in 2007. Four years later, in 2011, the Commissioner had proposed a plain of rehabilitation. American Motorists Insurance Company ("AMICO") was the only objector to the plan.

AMICO was the successor in interest to counterparties under various reinsurance agreements that Manhattan Re entered into during the 1970s. Through the agreements, Manhattan Re had ceded certain risks to AMICO under policies that Manhattan Re wrote. To secure its payment obligations, AMICO posted a letter of credit for Manhattan Re's benefit. Manhattan Re was entitled to draw the full amount of the letter of credit if AMICO failed to maintain the letter of credit or otherwise provide substitute security.

In 2003, AMICO notified Manhattan Re that it would not be able to renew the letter of credit. Manhattan Re drew down the full balance of the letter of credit in the amount of $7,392,000 and held the funds in a segregated account to secure AMICO's payment obligations under the reinsurance agreements. The decision called these amounts the "AMICO Fund." Once Manhattan Re entered liquidation, the Commissioner contended that the AMICO Fund belonged to Manhattan Re and constituted a general asset of the estate. The Commissioner's proposed plan of rehabilitation treated the amounts in the AMICO Fund as unrestricted assets to be used to satisfy Manhattan Re's general obligations to policyholders and creditors, as well as any administrative fees and expenses incurred by the Commissioner.

AMICO objected, contending that the amounts in the AMICO Fund were restricted cash collateral that only could be used to pay AMICO's obligations as a reinsurer of Manhattan Re. The underlying reinsurance contracts contained arbitration clauses, and AMICO asked the court to refer the dispute over the proper characterization of the AMICO Fund to arbitration.

The Commissioner opposed having the dispute arbitrated. First, the Commissioner argued that an arbitration clause in a pre-petition agreement is not binding on the chief insurance regulator in the domiciliary state when performing its regulatory functions in a delinquency proceeding under the Uniform Act. After considering various authorities, the *Manhattan Re* decision held that it had discretion to order that the dispute be resolved by arbitration. 2011 WL 4553582 at *7. That aspect of *Manhattan Re* is not implicated here.

Second, the Commissioner contended that even if the court could order arbitration, there was an existing anti-suit injunction, entered in 2007, that barred the arbitration proceeding from going forward. As this decision has noted on several occasions, the court in *Manhattan Re* held that it had the discretion to lift its injunction if doing so "would not interfere with the operation of the [Uniform] Act and would further the interest of an orderly resolution of the rehabilitation of Manhattan Re." *Id.* at *8.

On the facts presented, the court in *Manhattan Re* lifted the anti-suit injunction. Although the *Manhattan Re* decision did not conduct a multi-factor analysis, its reasoning suggests that the court evaluated key considerations that this case has identified. The different result in *Manhattan Re* stems from the reality that the factual record pointed in the opposite direction.

Most prominently, the *Manhattan Re* court took into account considerations analogous to the third factor evaluated by this decision, namely whether permitting a claimant to proceed with the foreign litigation would prejudice the interests of the Commissioner, other claimants, and other interested parties. The *Manhattan Re* court noted the advanced state of the rehabilitation proceeding and the reality that having the

55

status of the AMICO Fund determined by arbitration would not harm any of Manhattan Re's policy holders:

> There apparently are only eight remaining policy claims against the assets of Manhattan Re, and all of those claims will be covered by either AMICO or the AMICO Fund. Therefore, there is no question that the remaining policyholders will be protected, regardless of whether the dispute over the AMICO Fund is resolved through arbitration or litigation in this Court.

*Id.* Unlike in this case, permitting the arbitration to proceed did not present any risk that funds would be diverted from higher priority claimants and conflict with the core purposes of the Uniform Act.

Relatedly, the *Manhattan Re* decision recognized in substance that having the status of the AMICO Fund decided through arbitration would not prejudice the Commissioner. Unlike the Bank's claims in this case, the status of the AMICO Fund did not actually involve a claim against the estate. The question was whether and to what degree the AMICO Fund was an asset of the estate. AMICO's objection therefore was logically prior to the claims analysis and would have to be decided in any event, either by the court or someone else. There also was little difference between the two forums because the question predominantly was one of law under the governing agreements. As the *Manhattan Re* court observed, "there is no reasonable basis on which to believe that either party would suffer material prejudice by having an arbitral panel, rather than this Court, decide their dispute regarding the nature of the AMICO Fund." *Id.*

The *Manhattan Re* decision likewise appears to have considered the interests of judicial efficiency and litigant economy. As discussed above, pertinent considerations under this heading include whether the foreign litigation will proceed in a specialized

56

tribunal that has been established to hear the particular cause of action and whether the foreign litigation will completely resolve the claims. The *Manhattan Re* court noted that the arbitration provisions in the reinsurance agreements called for disputes to be resolved "before three disinterested executives from the insurance industry." *Id.* The arbitration provisions thus contemplated a sophisticated tribunal with expertise in the specific issue being presented, giving that forum a comparative advantage even when compared to a delinquency proceeding under the Uniform Act. Moreover, the outcome of the proceeding before the arbitration panel would decide completely the status of the AMICO Fund without any need for further analysis by the court.

The Bank's situation is materially different. The Bank wishes to assert fact-laden and legally complex claims in the South Carolina Action, and the nature of the litigation will diverge substantially from this court's streamlined evaluation of a recommendation by the Commissioner as to the treatment of a claim that remained contingent on the bar date and thus will not recover anything unless Freestone proves to have a surplus. The South Carolina Court is indisputably competent to decide any issue presented to it, but it is not a specialized tribunal, and it lacks the types of comparative advantages over a delinquency proceeding that the arbitration panel possessed in *Manhattan Re*. Equally important, the South Carolina Action cannot fully resolve the issues presented. Even if the Bank proceeded to trial in the South Carolina Action and obtained a decision from the South Carolina Court, that ruling would not end matters. The Bank would have to return to this court and participate in the Claims Process. There is also the likelihood that if the Anti-Suit Injunction is not lifted, no one ever will need to determine whether and to what

extent Freestone is liable to the Bank. Unlike in *Manhattan Re*, therefore, lifting the Anti-Suit Injunction in this case threatens to divert scarce resources from higher priority claimants, interfere with the activities of the Commissioner, and prejudice the administration of the receivership.

In light of the differences between the facts in *Manhattan Re* and the facts in this case, it should not come as a surprise that the two decisions reach different results. The *Manhattan Re* case involved a different type of dispute, a different type of alternative proceeding, and different implications for the delinquency proceeding before the court.

## III.    CONCLUSION

On the facts presented, lifting the Anti-Suit Injunction to permit the Bank to litigate against Freestone in the South Carolina Action would be contrary to the philosophy, structure, and purpose of the Uniform Act. The Bank's motion for relief from the Anti-Suit Injunction is denied.