**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| XACTUS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0260-KSJM |
| | ) | |
| MARK SIKE and CIC MORTGAGE | ) | |
| CREDIT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS[1]**

1.      Plaintiff Xactus, LLC provides consumer credit reports to mortgage lenders, including large banks, non-bank mortgage originators, and credit unions. Xactus is a Delaware entity, wholly owned by Cascade CISS Holdings LLC ("Cascade").  Xactus's key product is the "tri-merge credit report," which "merges the 'Big 3' credit reporting agencies' data—Equifax, Experian, and TransUnion—into a single easily digestible report."[2]  Xactus provides tailored pricing models for each client.   Preparing those models requires specialized and confidential client information.  "The process for determining each client's pricing model is proprietary to Xactus and has been developed over the course of Xactus's existence."[3]

2.      Defendant Mark Sike was a Xactus strategic account manager.  Sike began working for Xactus's predecessor, Credit Plus, Inc., in 2001.   Credit Plus

---

[1] The facts are drawn from the Verified Complaint for Injunctive Relief and documents it incorporates by reference. C.A. No. 2024-0260-KSJM, Docket ("Dkt.") 1 ("Compl.").

[2] *Id*. ¶ 11.

[3] *Id*. ¶ 14.

became Xactus after a merger in October 2021. As a Xactus strategic account manager, Sike "observed and utilized Xactus'[s] advantages over its competitors, including, without limitation the proprietary processes behind Xactus'[s] client specific pricing models."[4] He also gained and possessed detailed knowledge of Xactus's strategic clients, pricing information, and confidential business information. In addition, Sike "was involved in sales and strategy meetings in 2021, 2022 and 2023, where he learned of Xactus'[s] future nonpublic product innovations."[5]

3. Xactus offered Sike equity through the Cascade Management Holdco LLC Equity Incentive Plan (the "Incentive Plan") in 2022 and 2023. As part of the Incentive Plan, Sike entered into substantively identical Equity Grant Agreements in 2022 and 2023 (together, the "Equity Grant Agreements").[6] The Equity Grant Agreements are governed by Delaware law.[7]

4. The Equity Grant Agreements contain restrictive covenants (the "Covenant Agreements").[8] The Covenant Agreements each contain a non-solicitation provision that prohibits a grantee from directly or indirectly soliciting the current or potential clients of Xactus or its affiliates for twelve months.[9] The Covenant

---

[4] *Id.* ¶ 25.

[5] *Id.* ¶ 27.

[6] *Id.*, Ex. A ("2022 Equity Grant Agr."), Ex. B ("2023 Equity Grant Agr.").

[7] 2022 Equity Grant Agr. § 19; 2023 Equity Grant Agr. § 19.

[8] 2022 Equity Grant Agr., Annex C ("2022 Covenant Agr."); 2023 Equity Grant Agr., Annex C ("2023 Covenant Agr.").

[9] Compl. ¶ 31; 2022 Covenant Agr. ¶¶ 2, 4; 2023 Covenant Agr. ¶¶ 2, 4.

2

Agreements also contain non-competition and non-poaching provisions with twelve-month terms.[10]

5. The Incentive Plan requires that a grantee sign a joinder to the Cascade LLC Agreement (the "LLC Agreement").[11] Sike signed a joinder, by which he:

> acknowledge[d] that he has received and reviewed a complete copy of the [LLC Agreement] and agree[d] that upon execution of this Joinder, [Sike] . . . shall become a party to the [LLC Agreement] and shall be fully bound by, and subject to, all of the representations, warranties, covenants, terms and conditions of the [LLC Agreement] as though an original party thereto.[12]

6. The Equity Grant Agreements represent that "upon signing" a grantee "acknowledges, agrees and confirms" that the grantee is "bound by the terms, conditions, covenants, obligations, restrictions and agreements" of both the Covenant Agreements and the LLC Agreement.[13]

7. On January 5, 2024, Sike resigned from Xactus. On January 22, 2024, Xactus found an email that led it to conclude that Sike was working for a competitor, Defendant CIC Mortgage Credit, Inc ("CIC"), before Sike left Xactus. The email, dated January 19, 2024, was from an employee of Equity Resources, Inc., a "long standing and substantial Xactus client."[14] The Equity Resources employee sent the initial email to Amanda Cottrell, the Vice President of Operations of Equity

---

[10] Compl. ¶ 31 n.4; 2022 Covenant Agr. ¶¶ 2, 3; 2023 Covenant Agr. ¶¶ 2, 3.

[11] 2022 Equity Grant Agr., Annex B § 7(a); 2023 Equity Grant Agr., Annex B, § 7(a).

[12] Compl., Ex. A, Annex D, (Joinder Agreement, signed by Sike Aug. 31, 2022).

[13] 2022 Equity Grant Agr. §§ 9, 15(a); 2023 Equity Grant Agr. §§ 9, 15(a).

[14] Compl. ¶ 37.

Resources, to set up a virtual inspection. Cottrell then inadvertently copied Sike's (now former) Xactus email address (Mark.Sike@xactus.com) in her reply. Xactus alleges that "the email implied that Sike not only now worked for CIC, but also was actively soliciting Xactus'[s] clients" before his departure from Xactus.[15] After Xactus found this email, it discovered that Sike had "downloaded documents revealing the prices Xactus charges to its clients, including Equity Resources."[16] Equity Resources is now a client of CIC.

8. CIC hired Sike in January 2024. Since then, according to Xactus, Sike has attempted to solicit numerous other Xactus clients and has used Xactus's pricing data in his solicitations.

9. On January 26, 2024, Xactus's counsel wrote to Sike and CIC, accusing Sike of violating the Equity Grant Agreements by: "(1) using Xactus'[s] confidential information; (2) working for CIC, a direct competitor of Xactus; (3) directly soliciting several of Xactus'[s] current clients; and (4) directly soliciting a[] Xactus employee."[17] In response, Sike and CIC took the position that the Covenant Agreements were unenforceable.

10. Xactus filed this action against Sike and CIC ("Defendants") on March 15, 2024, asserting three counts: (1) breach of contract against Sike; (2) tortious

---

[15] *Id.* ¶ 38.

[16] *Id.* ¶ 39.

[17] *Id.* ¶ 54.

4

interference with contractual relationships against CIC; and (3) tortious interference with business relationships against Sike and CIC.

11. Defendants each moved to dismiss the complaint on March 26, 2024. The parties fully briefed the motions, and the court held oral argument on June 10, 2024.[18]

12. Defendants moved to dismiss the complaint under both Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim. Because the court lacks personal jurisdiction over Sike and CIC, this decision does not reach the Rule 12(b)(6) arguments. The case is dismissed.

13. "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[19] "In ruling on a Rule 12(b)(2) motion, the court may consider pleadings, affidavits, and any discovery of record."[20] If there is no discovery of record or evidentiary hearing, "plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[21]

14. Typically, Delaware courts resolve questions of personal jurisdiction using a two-step analysis, determining first whether service of process was

---

[18] *See* Dkt. 18 ("CIC's Opening Br."); Dkt. 29 ("Sike's Opening Br."); Dkt. 33 ("Xactus's Answering Br."); Dkt. 39; Dkt. 40.

[19] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[20] *Id.*

[21] *Id.* (quoting *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

5

authorized by statute, and second, whether the defendant had minimum contacts with Delaware sufficient to satisfy due process concerns.[22]

15.    The requirement that a court have personal jurisdiction is a waivable right.[23] "A defendant can agree to [the] court's exercise of personal jurisdiction."[24] That agreement can be express or implied.[25] When a party agrees to litigate in a forum, the party is considered to have implicitly consented to personal jurisdiction in that forum.[26] When a party has consented to jurisdiction, the court can forego the typical two-step analysis.[27]

16.    A person can consent to personal jurisdiction through a forum selection clause. A person may only be bound by a forum-selection clause, however, that is "unambiguous and willingly-drafted."[28] Parties must use "express language clearly

---

[22] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[23] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985).

[24] *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *10 (Del. Ch. Mar. 15, 2019) (collecting cases).

[25] *Id.* at *11.

[26] *Id.* at *11–15; *see also Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008) (citing *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999)).

[27] *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019); R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations*, §13.4 (4th ed., June 2024 update) ("Consent to personal jurisdiction is considered a waiver of any objection on due process grounds and an analysis under minimum contacts is considered unnecessary[.]" (cleaned up)).

[28] *Green Am. Recycling, LLC v. Clean Earth, Inc.*, 2021 WL 2211696, at *7 (Del. Super. June 1, 2021).

indicating that the forum selection clause excludes all other courts."[29]  "[I]n the absence of a clear, mandatory, and bargained-for forum selection clause, this court traditionally has proceeded with caution."[30]

17.  Xactus argues that Sike consented to Delaware courts' exercise of personal jurisdiction when he signed the Equity Grant Agreements.[31]  The Equity Grant Agreements do not contain Delaware forum selection clauses, even though they both contain Delaware choice of law provisions.[32]  The LLC Agreement, however, contains a forum selection clause, which Xactus argues applies because the Equity Grant Agreements incorporate the LLC Agreement by reference.[33]

18.  Section 15(a) of the Equity Grant Agreements states:

> The Grantee hereby acknowledges, agrees and confirms that upon signing this Agreement, the Grantee is hereby . . . bound by the terms, conditions and obligations contained in the [LLC Agreement] attached hereto as Annex D.[34]

19.  The LLC Agreement's forum selection clause provides:

> The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of

---

[29] *Scanbuy, Inc. v. NeoMedia Tech., Inc.*, 2014 WL 5500245, at *2 (Del. Ch. Oct. 31, 2014).

[30] *In re Liquid. of Freestone Ins. Co.*, 143 A.3d 1234, 1249 (Del. Ch. 2016).

[31] Xactus's Answering Br. at 16.

[32] 2022 Equity Grant Agr. §§ 9, 19.

[33] Xactus's Answering Br. at 17.

[34] 2022 Equity Grant Agr. § 15(a); 2023 Equity Grant Agr. § 15(a).

7

Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware) . . . . Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding.[35]

20. As a "transaction contemplated hereby," Xactus points to Section 3.04 of the LLC Agreement titled "Incentive Units."[36] Section 3.04 grants the Managing Member permission (as signaled by the word "may") to "issue a profit interest" on "terms and conditions set forth in any applicable Award Agreements."[37] Section 3.04 further provides that the "Managing Member, in its discretion, may adopt a written plan pursuant to which Incentive Units may be granted . . . ."[38] Section 3.04 also states that "[e]ach Award Agreement may include such terms, conditions rights and obligations as may be determined by the Managing Member, in its sole discretion, consistent with the terms herein."[39] Putting it together, Defendants argue that the agreement provided for in Section 3.04 of the LLC Agreement, the Award Agreement, is a transaction contemplated by the LLC Agreement and thus subject to the LLC Agreement's forum selection clause.

21. Defendants' argument is too much of a stretch. Again, parties must use "express language clearly indicating that the forum selection clause excludes all other

---

[35] LLC Agr. § 15.12 (emphasis added).

[36] *Id.* § 3.04.

[37] *Id.* § 3.04(a).

[38] *Id.* § 3.04(b).

[39] *Id.*

8

courts."[40]  Absent that, "this court traditionally has proceeded with caution."[41]  The Equity Grant Agreements do not contain express language clearly indicating that a forum selection provision excludes all other courts.  The "contemplated hereby" language is not express or clear, and it is not clear that Section 3.04—which merely authorizes other agreements—"contemplates" Award Agreements in any event.[42] The forum selection provision of the LLC Agreement does not bind the parties to the Equity Grant Agreements.  Sike did not consent to jurisdiction as to claims arising from the Equity Grant Agreements.

22.  Because Sike did not consent to jurisdiction, and as to CIC generally, Xactus must meet the traditional two-part test.  To do so, Xactus argues that the court has general jurisdiction over both Sike and CIC.[43]  It also argues that the court

---

[40] *Scanbuy, Inc.*, 2014 WL 5500245, at *2.

[41] *Freestone Ins.*, 143 A.3d at 1249.

[42] *See generally Newport Disc, Inc. v. Newport Elecs., Inc.,* 2013 WL 987936, at *5 (Del. Super. Mar. 11, 2013) (finding a forum selection clause in one agreement unenforceable as to claims arising from other incorporated agreements).  The "closely related" test cited by Xactus does not apply here because the alleged benefit received does not come from the agreement containing the forum selection clause.  *Cf. AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *11–12 (Del. Ch. Nov. 26, 2019) (applying "closely related" test to a partnership agreement that was being enforced, not an ancillary agreement); *Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (holding that the stockholders agreement at issue directly benefitted the plaintiff because it gave him a "right to a seat on the board of directors"); *McWane, Inc. v. Lanier*, 2015 WL 399582, at *7 (Del. Ch. Jan. 30, 2015) (holding that stockholders received a direct benefit from the merger agreement at issue through sale proceeds and escrow funds).

[43] Xactus's Answering Br. at 25.

9

has specific jurisdiction over Sike and CIC because they solicited Xactus clients with operations in Delaware.[44]

23. General jurisdiction grants authority to a state court to "assert[] jurisdiction over a nonresident defendant on the basis of wholly unrelated contacts with the forum."[45] "This all-purpose jurisdiction exists where a corporation's 'continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'"[46] Three forms of affiliation subject an entity defendant to general jurisdiction: (i) it is incorporated in the forum; (ii) it has its principal place of business in the forum; or (iii) its forum contacts "are so continuous and systematic as to render [it] essentially at home" there.[47]

24. Specific jurisdiction refers to incidents where the "suit aris[es] out of or relate[s] to the [corporation's] contacts with the forum."[48] To establish specific personal jurisdiction over a non-resident defendant pursuant to Sections 3104(c)(1) and (c)(2), "the transaction of business or performance of work and contracting to

---

[44] *Id.* at 21.

[45] *Genuine Parts Co. v. Cepec,* 137 A.3d 123, 129 (Del. 2016) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 426 (1984) (Brennan, J., dissenting)).

[46] *Id.* (quoting *Int'l Shoe,* 326 U.S. at 318).

[47] *Altabef v. Neugarten*, 2021 WL 5919459, at *4 (Del. Ch. Dec. 15, 2021) (citing *Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014)).

[48] *Genuine Parts*, 137 A.3d at 130 (quoting *Helicopteros,* 466 U.S. at 414 n.8).

supply services or things in the State" must "have a nexus to the designated conduct" giving rise to the cause of action.[49]

25.     Xactus argues the court has general jurisdiction over Sike based on his alleged solicitations of and business dealings with Xactus clients who have alleged business operations in Delaware.[50]

26.     This argument fails. Xactus's general allegations that Sike solicited some clients with a Delaware presence, without any indication that his conduct occurred in or was directed at Delaware comes nowhere close to establishing the type of "continuous and systematic general business contacts" that would allow Delaware to exercise general jurisdiction over him.[51] Sike lives in Pennsylvania and Xactus has not alleged that he regularly conducts business in Delaware, derives substantial revenue from Delaware, or has any other contacts that would make him essentially at home here.[52] The fact that certain Xactus clients Sike solicited have incorporated in Delaware or conduct some business here does not subject Sike himself to general jurisdiction.[53] Xactus has not alleged facts showing the kind of substantial, pervasive, and continuous Delaware contacts that would support general jurisdiction over Sike.

---

[49] *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986).

[50] Xactus's Answering Br. at 28 n.9.

[51] *Helicopteros*, 466 U.S. at 416.

[52] Compl. ¶ 7; Sike's Opening Br. at 11–12.

[53] *See Daimler*, 571 U.S. at 139 (stating defendant's contacts must be "so continuous and systematic as to render [it] essentially at home in the forum [s]tate" (internal citation omitted)).

27. Xactus argues the court has specific jurisdiction over Sike because he solicited Xactus clients with operations in Delaware.[54] In particular, Xactus points to Sike's solicitation of Equity Resources, a Delaware corporation with licensed loan originators in Delaware, and Union Home, which has a branch office and licensed loan originators in Delaware, as sufficient contacts to establish specific jurisdiction over Sike.[55] According to Xactus, by soliciting the business of these entities, Sike was transacting business in Delaware in a manner sufficient to establish personal jurisdiction, even if he did not physically enter the state.[56]

28. This argument also fails. The mere fact that some of the clients that Sike solicited happen to be incorporated in Delaware or have a presence here does not show he "transacted some sort of business in the state" or that Xactus's claims "arose out of that specific transaction" as required to establish specific jurisdiction under Section 3104(c)(1).[57] Although Equity Resources and Union Home may have some operations in Delaware, Xactus has not alleged that Sike's solicitations of those entities targeted their Delaware business or had any other connection to Delaware. Absent allegations that Sike engaged in conduct directed at this state, the fact that he solicited business from companies incorporated here or operating here is not

---

[54] Xactus's Answering Br. at 21–24.

[55] *Id.* at 22–23.

[56] *Id.* at 23 (citing *M & L of Del., Inc. v. Wallace*, 2004 WL 2370708, at *3 (D. Del. Oct. 18, 2004)).

[57] *EBP Lifestyle Brands Hldgs., Inc. v. Boulbain*, 2017 WL 3328363, at *3 (Del. Ch. Aug. 4, 2017).

enough to establish specific jurisdiction.[58] Xactus's reliance on *M & L of Delaware, Inc. v. Wallace* is misplaced. The defendant in that case physically traveled to Delaware to conduct business.[59] Xactus has not alleged any similar forum-directed conduct by Sike.

29. Xactus has failed to make a *prima facie* case as to Sike.

30. CIC is incorporated in Florida and headquartered in Tennessee.[60] Xactus does not allege that CIC is incorporated or has its principal place of business in Delaware. Instead, Xactus argues under *Daimler* that CIC's contacts render it "essentially at home" in Delaware.[61] The standard set in *Daimler*, however, is "a high bar that requires far more than doing business in the State."[62] "In most situations where the foreign corporation does not have its principal place of business in Delaware, that will mean that Delaware cannot exercise general jurisdiction over the foreign corporation."[63]

31. To support its "at home" argument, Xactus alleges that CIC "conducts business or contracts to supply services in Delaware . . . [and] seeks to establish a

---

[58] *See Ross v. Earth Movers, LLC*, 288 A.3d 284, 294 (Del. Super. 2023) ("Specific jurisdiction is triggered when the plaintiff's claims arise out of acts or omissions, by [that] defendant, that take place in Delaware."); *Hedger v. Medline Indus., Inc.*, 2017 WL 396770, at *5 (Del. Super. Jan. 27, 2017) (finding specific jurisdiction argument "frivolous" where no transaction "is alleged to have occurred in Delaware").

[59] *Wallace,* 2004 WL 2370708, at *1.

[60] Compl. ¶ 6.

[61] *Daimler,* 571 U.S. at 139.

[62] *Altabef,* 2021 WL 5919459, at *5.

[63] *Genuine Parts*, 137 A.3d at 127.

13

nationwide market for its products and services." It claims CIC "generat[es] credit reports for mortgage lenders, markets its products and services to mortgage lenders throughout the country, including to mortgage lenders located and conducting business in Delaware" and has "at least one contract" to supply services in Delaware with "Equity Resources, a Delaware corporation with an active l[e]nder license in Delaware."[64]

32.    Xactus contends that this contractual relationship with Equity Resources represents a "persistent course of conduct [in Delaware] . . . sufficient to justify the exercise of personal jurisdiction here."[65]  Xactus relies on *LaNuova D&B S.p.A. v. Bowe Co.*, where the Delaware Supreme Court denied a Rule 12(b)(2) motion to dismiss because an Italian corporation had an agreement for "the widespread distribution" of its "warranty, along with its product," including in Delaware.[66]  The Delaware Supreme Court found this represented sufficient direct or indirect contact to subject the foreign corporation to general jurisdiction.[67]

33.    But *LaNuova* was decided before the United States Supreme Court clarified the narrowed the scope of general jurisdiction in *Daimler*.[68]  In *Daimler*, the United States Supreme Court clarified that the "exceptional case" for subjecting a

---

[64] Xactus's Answering Br. at 27–28.

[65] Xactus's Answering Br. at 27.

[66] *LaNuova*, 513 A.2d at 768.

[67] *Id.*

[68] *Daimler,* 571 U.S. 117; *see also Genuine Parts*, 137 A.3d at 129 (holding that a defendant was not subject to general jurisdiction in Delaware where it was registered to do business and operated its own stores in the state.).

14

foreign corporation to general jurisdiction based on contacts unrelated to the suit requires showing the corporation's "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State."[69]  This "requires far more than doing business in the State," as a "corporation that operates in many places can scarcely be deemed at home in all of them.  Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States."[70]  After *Daimler*, regularly advertising, soliciting business, or engaging in some continuous course of activity in Delaware is not enough to establish general jurisdiction over a foreign corporation.[71]

34.    Xactus has not alleged that CIC is "at home" in Delaware under the *Daimler* standard.  It only asserts CIC has a contractual relationship with one Delaware corporation that appears to have some limited ties to the state.  Xactus does not allege that CIC is registered to do business in Delaware or that it has real presence in the state.  Regardless of the extent of CIC's alleged marketing and the single client relationship Xactus identifies, the facts as pled do not raise a reasonable inference that CIC's Delaware contacts are so substantial as to render it "essentially at home" in this state.  CIC is therefore not subject to general jurisdiction in Delaware.

---

[69] *Daimler*, 571 U.S. at 139 n.19.

[70] *Id.* at 139 n.20.

[71] *Genuine Parts*, 137 A.3d at 148; *see also Altabef v. Neugarten,* 2021 WL 5919459, at *7 (Del. Ch. Dec. 15, 2021) (finding that having numerous subsidiaries incorporated in Delaware did not subject their foreign parent corporation to the general jurisdiction of this court).

15

35. Xactus also argues that the court has specific jurisdiction over CIC because Sike, on behalf of Xactus, solicited companies with "Delaware business operations."[72] In particular, Xactus points to Equity Resources and Union Home.[73] "[S]pecific jurisdiction is triggered when the plaintiff's claims arise out of acts or omissions, by the defendant, that take place in Delaware."[74] Xactus does not allege that CIC committed any act in Delaware. Rather, Xactus asserts that Equity Resources is a "Delaware corporation with Delaware licensed loan originators" and Union Home has a branch office and Delaware-licensed loan originators.[75] And because Sike solicited them as an agent of CIC, Xactus argues that the court has specific jurisdiction over CIC.[76] This is not enough. There are a lot of Delaware corporations that operate nationwide and may have Delaware licensed operators. That does not mean that communications with those companies give rise to specific jurisdiction in Delaware.[77] Xactus has not established a prima facie case for specific jurisdiction over CIC.

---

[72] Xactus's Answering Br. at 22.

[73] *Id.* at 22–23.

[74] *Ross*, 288 A.3d at 294.

[75] *Id.* at 23.

[76] *Id.* at 24 (citing *Perry v. Neuport*, 2017 WL 6033498, at *17 (Del. Ch. Dec. 6, 2017) ("The plain language of the Long-Arm Statute recognizes that forum-directed activity can be accomplished 'through an agent.'" (quoting 10 *Del. C.* § 3104(c))).

[77] *See, e.g., CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *14 (Del. Ch. June 29, 2020) ("[I]n Delaware, '[i]t is well established law that merely contracting with an entity that is incorporated within a forum state does not provide necessary connections between the contract and the forum to support a finding of jurisdiction.'" (first alteration added) (quoting *Abajian v. Kennedy*, 1992 WL 8794, at

36. Perhaps recognizing the weakness of its jurisdictional arguments, Xactus requests jurisdictional discovery.[78] To establish a right to conduct limited discovery on the issue of jurisdiction, a plaintiff must "establish with reasonable particularity the possible existence of requisite contacts" within the State of Delaware.[79] A plaintiff must show that jurisdiction in Delaware is "minimally plausible."[80] Xactus's arguments fail to clear this threshold. Based on Xactus's allegations, no discovery would show that CIC was at home in Delaware, nor that this suit arises out of actions taken in Delaware.[81] This request is denied.

37. The court does not have personal jurisdiction as to CIC or Sike, and so all claims are dismissed under Rule 12(b)(2).

/s/ Kathaleen St. J. McCormick
Chancellor
Dated: August 27, 2024

---

*10 (Del. Ch. Jan. 17, 1992))); *Hedger,* 2017 WL 396770, at *5 (finding that "[i]t would be frivolous to argue for specific jurisdiction based on the facts alleged in the complaint" where no pertinent transaction "is alleged to have occurred in Delaware" and "no act or omission is alleged to have occurred in this State").

[78] Xactus's Answering Br. at 33–34.

[79] *CLP Toxicology, Inc.* 2020 WL 3564622, at *15.

[80] *300 W 22 Realty, LLC v. Strathmore Ins. Co.*, 2023 WL 2300628, at *4 (Del. Super. Mar. 1, 2023), *aff'd*, 309 A.3d 1265 (Del. 2023) (TABLE).

[81] *See In re Talc Prod. Liab. Litig.,* 2018 WL 4340012, at *10–12 (Del. Super. Sept. 10, 2018).